### HAMILTON WATCH CO. v. BENRUS WATCH CO., Inc.

#### Civil Action No. 4276.

United States District Court, D. Connecticut.

April 27, 1953.

310

Thomas G. Meeker, New Haven, Conn., Stephen Ailes and Richard A. Whiting, Washington, D. C. (Gumbart, Corbin, Tyler & Cooper, New Haven, Conn., Steptoe & Johnson, Washington, D. C., and Richard J. Blakinger, Lancaster, Pa., of counsel), for plaintiff-appellee.

Wiggin & Dana, New Haven, Conn., for defendant.

HINCKS, Chief Judge.

## Findings of Fact

1. Plaintiff, hereinafter called "Hamilton", is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and having its principal place of business in Lancaster, Pa., and is therefore a citizen of the Commonwealth of Pennsylvania.

2. Defendant, hereinafter called "Benrus", is a corporation organized and existing under the laws of the State of New York and has its principal office in New York City and therefore is a citizen of New York. Defendant maintains an office and operates a factory in Waterbury, Connecticut, and therefore may be found in and transacts business in the State of Connecticut.

3. This action arises under the anti-trust laws of the United States, and more particularly upon the so-called Clayton Act, 15 U.S.C.A. §§ 15, 18, 22 and 26.

4. Hamilton is engaged in the business of manufacturing jeweled lever escapement watches and selling the same under the trade name "Hamilton" directly to over 12,000 retail jewelers throughout the country.

5. Hamilton's dollar volume in these watches amounted in 1950 to $18,719,000, in 1951 to approximately $16,000,000, and in 1952 to approximately $14,000,000.

6. Hamilton's sales in 1950 accounted for at least 11% of the dollar volume of the aggregate sales of branded jeweled watches in the United States by firms having any nation-wide advertising. Hamilton's sales of jeweled watches in 1950 constituted about 6% of the unit sales of all jeweled watches in the United States in that year. In 1950 Hamilton's sales were the fourth largest in the industry in dollar volume. In 1951 and 1952 Hamilton sold somewhat lesser percentages than in 1950.

7. Benrus is engaged in the business of importing jeweled watch movements, which it manufactures in Switzerland. It manufactures cases at its plant in Waterbury, Connecticut, and sells completed watches under the trade name "Benrus" in the United States. The majority of Benrus' watches are sold to retail jewelry stores, including many who also purchase and sell Hamilton watches.

8. Benrus' gross income in 1950 was approximately $16,000,000, in 1951 $18,000,000, and in 1952 in excess of $19,000,000. It may be that a minor part of this was attributable to government war work but I find nothing in the evidence to show this, beyond the denial in Benrus' answer, or if so the volume of such war work.

9. Benrus' sales in 1950 accounted for about 9½% of the dollar volume in nationally advertised branded jeweled watches sold in the United States. Benrus' sales of jeweled watches constituted about 9% of the unit sales of all jeweled watches in the United States in 1950 and were the fifth largest in the industry in dollar volume. In 1951 and 1952 Benrus' sales (in dollars) exceeded the dollar volume of Hamilton's sales.

10. The leading companies selling jeweled lever watches in the United States are Elgin National Watch Company and Bulova Watch Company, each of which in 1951 and 1952 sold in the United States more jeweled lever watches than Hamilton and Benrus combined, as measured both by number of units and by dollar amount. The "Big Six" of the watch industry (Elgin, Bulova, Benrus, Longines-Wittnauer, Hamilton and Gruen) account for about 90% of the sales of nationally advertised branded jeweled watches.

11. Hamilton watches are superior in quality to Benrus watches, and are in part distributed in different trade channels and in different manner from Benrus watches. Hamilton manufactures very fine jeweled lever watches most of which contain 17 jewels and comparatively few 21 jewels. Benrus does not manufacture or sell any watches with more than 17 jewels. Benrus like Hamilton manufactures and sells chronographs and self-winding watches. Hamilton, unlike Benrus, sells pocket watches. Benrus, unlike Hamilton, sells calendar watches. In the eyes of the public the watches of both companies compete.

12. Benrus watches range in retail price from $24.75 up; Hamilton's from $49.50 up. In 1952 Hamilton began to import Swiss movements for ultimate sale in the United States under the name of "Illinois"; this line of watches is to retail from about $30. Some 70% of plaintiff's watches are sold at prices of $71.50 or less; 96% of defendant's watches are sold at prices of $71.50 or less.

13. Hamilton and Benrus compete actively with one another in interstate commerce in the sale of nationally advertised branded jeweled watches and with all other companies selling jeweled watches.

14. The effect of a merger of Hamilton and Benrus may be substantially to lessen the active competition now existing between the two in the sale of jeweled watches in the United States. By the same token such a merger would substantially lessen competition in the sale of jeweled watches in the United States. The control of Hamilton by Benrus or even Benrus' representation on Hamilton's board through its stock ownership would afford an opportunity not otherwise present for collaboration tending to lessen competition.

15. During the year 1952 there were 387,019 shares of Hamilton common stock outstanding. In addition there were 34,900 shares of $100 par cumulative preferred stock (convertible into common stock) issued and outstanding.

16. Prior to March 20, 1952 the largest single block of stock held by any one of Hamilton's stockholders was slightly over 10,000 shares; less than 10 stockholders held as many as 5,000 shares.

17. Hamilton stock prior to the year 1952 had been traded in lightly; between the years 1947 and 1951 the annual average number of shares traded was 39,840 shares.

18. During the first quarter of 1952 Hamilton sustained an operating loss of over $600,000.

19. Hamilton paid regular dividends of $1.00 per share on its common stock during and following the war. In 1950 an extra dividend of 15¢ was paid. During the first quarter of 1952 Hamilton paid its regular 25¢ quarterly dividend in March. At its directors' meeting of April, 1952 Hamilton passed its first dividend since the commencement of World War II. Dividends were also passed during the last three quarters of 1952, but were resumed for the first quarter of 1953.

20. Since 1950 the management of Hamilton has been reorganized, two successive presidents and a vice-president in charge of sales having died.

21. After the outbreak of the Korean war in June 1950, retailers over-expanded their inventories of jeweled watches and in the same period there was intensified competition from imported watches. These factors account in part for the decreased sales of Hamilton.

22. In late May 1952 Hamilton announced that as of August 1952 it was abandoning its traditional method of selling through wholesalers and would sell direct to retailers through a newly recruited staff of salesmen. This resulted in a re-

duction of its retail outlets from 15,000 to 12,000.

23. Commencing on January 29, 1952 and ending on March 13, 1952, Benrus purchased 22,176 shares of stock in the Elgin National Watch Company at an aggregate cost of $313,859.50.

24. Other than Hamilton, Elgin is the only jeweled watch company all of whose manufacturing operations are within the U. S. and which is manufacturing watches in substantial quantities. Some other watch companies, e. g., Bulova, manufacture watches both in the United States and in Switzerland.

25. The sales of Elgin trebled since 1946 and ever since then the company has continuously paid its regular dividends.

26. Commencing on March 17 and ending on June 18, 1952 Benrus sold its entire holdings of Elgin stock sustaining a net capital loss of $9,079.47.

27. Before purchasing Hamilton stock Benrus ascertained that a considerable amount of Hamilton stock was available, that the directors and management of Hamilton controlled only a small portion of this stock, and that there were no other large stockholders.

28. On March 17, 1952, when Hamilton stock had a book value in excess of $20, Benrus began to purchase Hamilton stock in substantial quantities, all on the New York Stock Exchange. From March 17, 1952 to June 13, 1952 Benrus purchased 51,800 shares. As a result of the decline in the market from $13\frac{1}{8}$ to $11\frac{3}{4}$ during said period Benrus held this stock at an average price of approximately $12\frac{3}{4}$.

29. In June 1952, after Benrus had acquired approximately 10% of the voting stock of Hamilton, Benrus advised the president of Hamilton of this fact and stated that the purchase had been made as an investment. The fact of such purchases was duly reported by Benrus to the Securities and Exchange Commission.

30. From June 16, 1952 to September 17, 1952 Benrus purchased an additional 40,400 shares at prices ranging from $12\frac{1}{4}$ to 18, at an average price of over $16\frac{1}{4}$; the last purchase was for 2400 shares at

18. The average price for Benrus' entire holdings of Hamilton stock was $14\frac{1}{8}$ and the total cost to Benrus was $1,318,660.54.

31. Benrus during said period often purchased Hamilton stock at different prices on the same day. The widest variation on a single day was on July 15th when the range of prices paid by Benrus was two points. Generally, however, the prices paid on a single day varied by less than one point.

32. At an average price of $14\frac{1}{8}$ per share the common stock of Hamilton on the basis of its regular dividend yields a 7% return.

33. Under agreement dated July 23, 1952 certain of Hamilton's stockholders organized a 10-year voting trust and solicited deposits of stock therein. Under the terms of the trust the stockholders participating have no rights to vote or in any way to control the action of the voting trustees. A S.E.C. prospectus dated August 1, 1952 reveals that nineteen stockholders had agreed to deposit 45,578 shares in the trust, and that a stock purchase syndicate was contemplated. According to the report of the S.E.C. dated November 19, 1952, 154,908 shares had already been deposited with, or pledged to, the voting trust. This amounts to 40% of Hamilton's common stock.

34. The express purpose of the voting trust was to prevent Benrus from gaining control over the policies or management of Hamilton through merger, consolidation or otherwise. This purpose was achieved at least for an indefinite period. The voting trust has effective working control and the management has been assured of support from additional stockholders to give it an absolute majority of the outstanding voting stock.

35. By August 1, 1952 Benrus had acquired 80,600 shares of Hamilton stock, or 87.5% of its final holding. By July 23 Benrus had acquired 80,000 shares, or nearly 87% of its final holding. On September 17, 1952 (which is the only date in September when any purchases were made) Benrus purchased 3800 shares of Hamilton stock.

36. Since October 1, 1952 Hamilton stock has sold at about $14 per share.

37. Benrus owns at the present time 92,200 shares of Hamilton's outstanding common stock, or about 24%. There are approximately 154,908 shares deposited in or pledged to the voting trust, or about 40%. About 139,911 shares, or 36%, are outstanding in other hands some of which, as above stated, are friendly to the voting trust. In addition there are 34,900 shares of $100 par convertible preferred shares outstanding which at present have no voting rights.

38. The business of Benrus is dependent on the importation of watch movements into the United States from Switzerland and on the existence of tariffs permitting such importation. Were tariffs to be greatly increased, or were war or similar conditions in Europe to block importation of Swiss watch movements the business and income of Hamilton and Elgin, which manufacture watch movements only in the United States would be favorably affected.

39. During the first half of 1952 there was outstanding a U. S. Tariff Commission recommendation that import duties on Swiss watch movements be increased. This recommendation was rejected by President Truman on August 14, 1952, at which time Benrus had completed over 90% of its purchases of Hamilton stock. On February 18, 1953 bills were introduced into Congress, but have not yet been enacted, which would require the President to put into effect the recommendation of the Tariff Commission.

40. An investment in a company manufacturing watch movements in the United States would be, at least to a certain extent, a hedge for Benrus against the danger of reduction in its income through the impact of increased tariffs or of world conditions cutting off Swiss imports, for Benrus would to a substantial extent be compensated by the correspondingly increased value of the stock of the domestic watch manufacturing company in which it invested.

41. On March 1, 1952, before Benrus had started to purchase Hamilton stock but after it had expended about $285,000 in purchases of Elgin stock, Benrus had (a) cash on hand of $1,488,000, (b) accounts or notes receivable totalling $3,932,000, (c) long term indebtedness of $1,350,000, and

(d) no short-term indebtedness. On September 1, 1952, after Benrus had divested all of its Elgin stock and had invested about $1,213,500 in Hamilton stock but before its final Hamilton purchases of over $105,000 were made, Benrus had (a) cash on hand of about $970,000, (b) accounts or notes receivable totalling $4,951,000, (c) long term indebtedness of $1,200,000, and (d) short-term indebtedness of $2,000,000. On January 31, 1952 Benrus' gross assets were $9,925,359.56 and its net assets $5,636,434.-22.

42. On January 5, 1953 Benrus' president advised officers of Hamilton that as a hedge against possible future difficulties in importing watch movements from Switzerland there were two alternatives: (1) to acquire facilities and trained technicians in the United States, which would have been prohibitive in cost and time; or (2) to acquire a substantial financial interest in an existing company which manufactured movements in the United States. He stated further that it was in line with the second alternative that Benrus bought the Hamilton stock.

43. In June 1952 Benrus held patent rights for the manufacture of an automobile clock but did not have the facilities for its manufacture in the United States. Benrus mentioned this fact to one Dennis of the Chase Bank, which was transfer agent and registrar of stock for Hamilton, and suggested that Hamilton might have such facilities and suggested that a mutually beneficial arrangement might be negotiated.

44. On January 23, 1953 the president of Benrus offered to refrain from voting Benrus' 92,200 shares of stock for one year if Hamilton's management would bring about a dissolution of the voting trust.

45. Benrus insists upon its right to vote its shares of stock in Hamilton and will do so at the Hamilton stockholders' meeting on April 14, 1953, unless enjoined.

46. By letter dated December 9, 1952 Benrus' president stated that as of that time Benrus had no intention to solicit proxies.

47. By cumulative voting under Pennsylvania law Benrus will be able to elect

314

for a term of three years at least one director at the meeting of stockholders on April 14, 1953.

48. Benrus purchased the Hamilton stock for the purpose of obtaining collaboration from Hamilton advantageous to Benrus by acquiring stock control or by merger. Benrus did not purchase the stock solely for investment.

49. Prior to the consolidation of control in the voting trust it was probable that the acquisitions of Hamilton stock by Benrus would give Benrus control of Hamilton or failing that, at least collaboration brought about through representation on the Hamilton board accomplished by the exercise of its right to cumulative voting provided by Pennsylvania corporation law. The effect of control or collaboration thus obtained would probably have been to lessen competition in the sale of jeweled watches in the United States.

50. Benrus now has no control or power to control Hamilton and while the voting trust remains in effect cannot by its efforts alone obtain control. However, if allowed representation on the Hamilton board and thus to participate in Hamilton's management it will be afforded opportunity not now available to it to bring about collaboration.

51. The association of Benrus' name with Hamilton as a consequence of the publicity given to Benrus' purchases of Hamilton stock has already impaired Hamilton's competitive position in the market which it serves: it has impaired the effectiveness of Hamilton's vigorous new merchandising policy because of antagonism on the part of retail jewelers to Benrus' practices and reputation with respect to the fair trade principles of the industry and its merchandising policies; at least the record contains a prima facie showing to that effect.

52. Hamilton's relatively poor showing in 1951 and 1952 began before Benrus' purchases began and insofar as it continued after the beginning of Benrus' purchases other factors than that set forth in Finding 51 were contributing causes.

53. The election to the Hamilton board of one or more directors by Benrus will prevent Hamilton from convincing denial that Benrus has a part in shaping Hamilton's policies.

54. A director on Hamilton's board elected by Benrus would be in a position to obtain confidential information of value to Benrus as a competitor, the disclosure of which would be harmful to Hamilton and would materially impair its competitive position. In participating in the management, such a director would be subject to frequent conflicts of loyalties involving decisions dependent upon the exercise of his judgment faculties many of which would be of such a nature that it would be impossible to demonstrate the presence or extent of the Benrus influence if that had been a factor. Common experience has demonstrated that stockholders' suits, as a remedy for grievances growing out of such situations, are expensive and of doubtful efficacy. The Benrus stake in Benrus is many times greater than its stake in Hamilton. The presence of such a director on the Hamilton board would create a situation in which Benrus would have power to discourage the vigor of competition by Hamilton and so to embarrass and impede Hamilton's management that it might well be driven to unwanted collaboration or to a merger as the least of two evils. Such a situation would constitute irreparable harm to Hamilton.

55. Hamilton will be irreparably damaged if Benrus shall exercise its electoral rights by voting its Benrus stock at the April 14th stockholders' meeting.

56. The granting of a preliminary injunction will not seriously impair the pecuniary value of Benrus' stock holding as an investment only.

Conclusions of Law

1. This court has jurisdiction to entertain the complaint herein and the pending motion.

2. The language of Section 7 of the Clayton Act as amended forbidding acquisitions of "all or any part of the stock" of a competitor was intended if in other respects applicable to include within its ban

not only acquisitions of a majority interest and an interest effective to carry control but also an interest carrying an electoral right large enough to enable the competing holder to elect its nominee to the board.

■ 3. The language of Section 7 of the Clayton Act as amended whereby the ban on stock acquisitions was limited to those the effect of which "may be" substantially to lessen competition should be interpreted as restricted to acquisitions which by a *reasonable probability* will be effective substantially to lessen competition.

■ 4. A purchase in contravention of Section 7 of the Clayton Act is illegal not only when made but also remains illegal even if the purchaser's purpose to obtain control or collaboration through the purchase fails of achievement.

5. Control of Hamilton by Benrus under the facts shown here would have been effective substantially to lessen competition in the jeweled watch industry within the meaning of Sec. 7 of the Clayton Act, as amended.

6. Defendant's purchase of Hamilton stock was in violation of Section 7 of the Clayton Act.

7. The defendant's present purpose to vote its Hamilton stock in Hamilton's forthcoming annual meeting, if accomplished, will probably be effective substantially to lessen competition.

■ 8. The defendant's right under Pennsylvania law to vote the stock must give way to the overriding policy of the anti-trust laws of the United States.

9. The defendant's claim of right to vote the stock constitutes imminent threat of harm to the plaintiff.

■ 10. For the plaintiff to prevail on its motion it is not necessary for it to prove, or even to make a *prima facie* case, of threatened acts constituting the tort of unfair competition as defined by the common law.

■ 11. The electoral right appurtenant to stock purchased in violation of the Clayton Act is a fruit of illegality the exercise of which may be enjoined.

■ 12. That stock was acquired by a competitor in violation of the Clayton Act is a fact which may be considered together with other pertinent evidence in determining whether an inference is warranted that a director elected by that stock will probably not abstain from effort the effect of which may be substantially to lessen competition.

■ 13. The parties hereto are competitors in the sale of jeweled watches and as such are engaged in a "line of commerce" within the meaning of Section 7 of the Clayton Act.

■ 14. A preliminary injunction should be granted to prevent irreparable damage to the plaintiff which plainly outweighs any forseeable harm to the defendant.

15. Benrus' acquisition of Hamilton stock was not "solely for investment" within the meaning of the third paragraph of Section 7 of the Clayton Act.

16. The threatened harm to the plaintiff is enjoinable under Section 16 of the Clayton Act.

17. The injunction now sought should be issued in terms substantially as prayed and

It is now so ordered.

The parties may submit for entry forms of order deemed appropriate, for settlement in chambers on April 13, at 10:30 A. M.

### Opinion

It is plain that the preliminary injunction sought should not have been granted unless there was a sufficient showing that the defendant in acquiring its Hamilton stock violated Section 7 of the Clayton Act, as amended. It is equally plain, and I think also undisputed, that there would be a violation of Section 7 here only if the situation here was such that an acquisition of control of Hamilton by Benrus would have constituted a violation. That in the situation here such acquisition of control would indeed have constituted a violation, I found myself persuaded by the reasoning and citations appearing in plaintiff's briefs and have nothing now to add. Its position on

the several factors involved in this question is sustained by my findings and conclusions.

■■■ Next arises a question of law. May the acquisition of a competitor's stock insufficient to carry control constitute a violation? On this point too, the plaintiff's briefs satisfied me that its position is sound even though there appears as yet to be no precedent directly in point under Section 7 as amended by the Act of December 29, 1950. 64 Stat. 1125. My answer is "yes", in cases in which there is a showing that the acquisitions were made pursuant to a plan or purpose to obtain control the achievement of which, at the time the acquisitions were made, was reasonably probable and which, if achieved, would probably have had the effect to substantially lessen the competition which the amended Act sought to preserve. Whether this stated condition of the answer has been satisfied is essentially a question of fact and in so far as the question depends upon the defendant's plan or purpose a further discussion of the underlying facts may serve a useful purpose.

■■■ Were the acquisitions made for investment purposes only as Benrus contends? In my judgment such a finding would have been naive. The underlying facts rather require an inference that the purchases were made with a purpose to obtain control. Benrus spent over $1,300,000 for the stock, much of which appears to have been borrowed. Although less than 40,000 shares per year of Hamilton stock were previously traded, Benrus bought 92,200 shares in six months undeterred by a rising market. The market price returned to normal soon after Benrus ceased buying. This suggests that a pure investment policy would have been pursued with more patience. The holding is obviously of limited liquidity. Benrus made no offer to show that its Hamilton stock was but one item in a diversified investment portfolio or to justify the soundness of an investment policy which flouts the investment precept of diversification. I think it of considerable significance that Benrus ceased purchasing almost as soon as it had become apparent that the voting trust had at least for the time being consolidated control. Even if it be so that the Hamilton stock was at normal dividend rates a good buy at the average price paid, this does not require a finding that the purpose of the acquisition was investment only. Cf. Chesapeake and Ohio Railway Purchase, 271 I.C.C. 5, 14 (1948). However, the condition of Hamilton was not good in most of 1952. For the first time since the war dividends were being passed and sales had been declining for two years. On the other hand, Elgin sales were booming: yet Benrus had just disposed of a sizable "investment" in the stock of that company. Benrus' claim that its Hamilton holding was intended merely as an investment hedge against a possible raising of the tariff wall, all of Benrus' manufacturing facilities being in Switzerland, is not inconsistent with a finding that control of Hamilton was an objective in the Benrus policy. For if Benrus should suffer by inability to continue its Swiss imports its control of Hamilton would greatly facilitate its use of Hamilton as a source of supply for its movements. Furthermore, Elgin like Hamilton was a company which had manufacturing facilities only in the United States, yet Benrus sold all its recently acquired Elgin stock and concentrated entirely on Hamilton. And the very size of Elgin might have obstructed acquisition of a controlling interest by Benrus. Lastly, Benrus' plainly evidenced hostility to Hamilton's voting trust, the effect of which was to consolidate control in the management, is not plausibly explained if its purchases were merely for investment.

■■■ Even if, contrary to my inference, the acquisitions were made without a formulated purpose to obtain control, there was at least a purpose to obtain minority representation on the Hamilton Board. Benrus was chargeable with knowledge of the Pennsylvania Corporation law providing for cumulative voting. It acquired a sufficient amount of stock to enable it under that law to elect each year at least one director for a three-year term, and an intent to hold the stock without exercise of the appurtenant electoral right is highly improbable and completely refuted by its subsequent conduct. It must be deemed to have intended the natural consequences of its own act in acquiring the stock.

In the situation here, I incline to the view that the acquisition if made only with intent to obtain minority representation constituted a violation of Section 7: having in mind the probable effect on the relevant "line of commerce" of the competitive practices of these two competitors and the practical considerations that confront the board of directors of any corporation in a competitive enterprise, I think it fairly inferable that minority representation, because of the opportunity thereby afforded to persuade or to compel a relaxation of the full vigor of Hamilton's competitive effort would come within the ban of Section 7. In Chesapeake & Ohio Railway Company Purchase, 271 I.C.C. 5, it was held that even minority representation by a petitioning railroad on the board of a competitor would probably so disturb the competitive situation that the petitioner was restricted in the exercise of the electoral right appurtenant to its stock.

The plaintiff, of course, to prevail must prove not only a violation of Section 7 of the Clayton Act but also that it is in immediate danger of "irreparable loss or damage" and hence qualified for injunctive relief under Section 16 of the Clayton Act. 15 U.S.C.A. § 26. As to this, beyond dispute there was immediate danger that Benrus if allowed to vote its stock at the April, 1953, annual meeting would obtain a minority representation on the Hamilton board. And the immediate effect of such representation would be (Finding 54) as between Hamilton and Benrus to improve the competitive position of Benrus with a reciprocal impairment of Hamilton's position. This, I think, is a sufficient showing of immediately threatened irreparable damage to bring the case within Section 16. Finding 51 lends some further support to the claim of irreparable damage although, as intimated, that finding rests upon a foundation that might not survive a plenary trial.

In this connection, right thinking suggests a distinction between the private harm constituting the irreparable damage which is the primary concern of Section 16, and the lessening of competition in the relevant "line of commerce" which constitutes the public harm with which Section 7 is primarily concerned. Doubtless cases may arise in which the envisaged public harm is present without the private harm, and *vice versa*. Of course private harm resulting neither from a public harm nor a common law tort is *damnum absque injuria*. Here I have held that Hamilton's threatened loss of competitive position to Benrus is a private harm constituting irreparable damage under Section 16, which became enjoinable upon a showing that the Benrus acquisitions were in violation of Section 7. The private harm that results only from lawful competition is of course *damnum absque injuria,* and as such is not enjoinable. But that maxim has no pertinence when the harm is caused either by common law tort or by violation of the anti-trust laws. In either case, the *injuria* as well as the *damnum* is present.

The foregoing outline, if supplemented by the plaintiff's briefs, will show the reasoning which in my judgment required the issuance, in limited scope, of the preliminary injunction.