BRIGGS MANUFACTURING COM-
PANY, a Michigan corporation,
Plaintiff,

v.

CRANE CO., an Illinois corporation,
Defendant.

Civ. A. No. 20055.

United States District Court
E. D. Michigan, S. D.

May 28, 1960.

Byron D. Walter, Henry M. Campbell, III, Monaghan, Monaghan & Crawmer, Detroit, Mich., Joseph W. Louisell, Detroit, Mich., of counsel, for plaintiff.

James E. Tobin, Emmett E. Eagan, Richard B. Gushee, Miller, Canfield, Paddock & Stone, Detroit, Mich., for defendant.

Alan B. Hobbes, Assistant General Counsel, Rufus E. Wilson, Francis C. Mayer, Gerald Harwood, for Federal Trade Commission, Washington, D. C., amici curiae.

LEVIN, Chief Judge.

Briggs Manufacturing Company (hereinafter referred to as Briggs), a Michigan corporation with its principal place of business within this district, filed this action against the Crane Co. (hereinafter referred to as Crane), an Illinois corporation doing business within this district, alleging that certain purchases of Briggs stock by Crane violated Section 7 of the Clayton Act (15 U.S.C.A. § 18).

Treble damages and injunctive relief were requested under Sections 4 and 16 (15 U.S.C.A. §§ 15 and 26).[1]

There is now before the Court a motion for a preliminary injunction to enjoin Crane from soliciting proxies and from voting its shares of Briggs stock at a shareholders meeting scheduled for June 17, 1960, or at future shareholders meetings, pending a decision on the merits or a final adjudication of a current Federal Trade Commission complaint against Crane charging violations of Section 7 of the Clayton Act and Section 5 of the Federal Trade Commission Act.[2] A brief from the F.T.C. as *amicus curiae* in support of the application for temporary injunction has been received.

I have the benefit of numerous affidavits and exhibits submitted by both parties and extensive and able oral arguments. Plaintiff's counsel proffered testimony of ten witnesses but, after agreement with Crane's counsel, submitted affidavits instead.

Briggs has been manufacturing, selling and distributing plumbing fixtures, fittings and supplies in interstate commerce since 1935. The products are sold directly to over 500 independent wholesale distributors throughout the country and to some large chain store outlets. It

---

1. The pertinent provisions of Section 7 are:

 "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

 "No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more corporations engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.

 "This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition * * *."
 Section 4 reads as follows:

 "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws, may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three- fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."
 Section 16 reads:

 "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger or irreparable loss or damage is immediate, a preliminary injunction may issue * * *."

2. Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45, declares "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce" to be unlawful.

 The F.T.C. complaint alleges that Crane may, through acquisitions of Briggs, Chapman Valve Manufacturing Company, National—U. S. Radiator Corporation, Swartwout Company, Inc., and Pipe Fabricators, Inc., substantially lessen competition within the meaning of Section 7 of the Clayton Act, in the production, distribution, and sale of: (1) valves and fittings; (2) plumbing fixtures and fittings; (3) heating equipment and auxiliary or related products; (4) fabricated steel pipe. It also charges the acquisitions constitute unfair methods of competition and unfair acts and practices prohibited by Section 5 of the Federal Trade Commission Act.

appears that Briggs ranks as the sixth largest seller of plumbing fixtures, fittings and supplies in the country, accounting for approximately 6 per cent of the national market in those products.

Crane likewise is engaged in the manufacture, sale and distribution in interstate commerce of plumbing fixtures, fittings and supplies, in addition to other related products. Crane's gross revenue in 1958 was $336,196,279 of which an estimated $30,000,000 was from the sale of plumbing fixtures, fittings and supplies, and in 1959 the gross revenue from these products was estimated to be $35,000,000. Plaintiff alleges that Crane is the fifth largest seller dollarwise of plumbing fixtures, fittings and supplies and accounts for approximately 10 per cent of the total dollar volume in the industry.

Briggs, a publicly held corporation listed on the New York Stock Exchange, has 1,078,834 outstanding shares of voting common stock. Crane, as of May 10, 1960, held of record 231,674 shares, and it has freely admitted, both in communications from Mr. T. M. Evans, its Chairman of the Board, to the Briggs management and in the answer to the complaint, that its intention never was to obtain the Briggs stock as an investment.[3] Rather, the defendant's purpose was to submit to the Briggs directors and shareholders proposals concerning the sale of the Briggs assets to Crane. Crane felt that acquiring the Briggs plants in Michigan and Ohio would be preferable to building new plants to serve its own middle west market. As Mr. Evans stated, the Briggs plants would "make a logical addition to Crane's manufacturing facilities * * *."

The decision of Crane to absorb Briggs followed a financial and marketing analysis of Briggs' organization. Crane commenced purchasing Briggs stock in the open market on August 25, 1959. Crane's intentions were given extensive publicity in the Wall Street Journal, trade journals and daily newspapers, causing disturbances in the industry and among Briggs' distributors and employees in particular. On November 23, 1959, Crane made an offer to the Briggs Board of Directors for the outright purchase of all the Briggs assets. This offer was rejected.

Thereafter, in a letter to the president of Briggs, Crane requested a list of Briggs shareholders in order to enable it to solicit from them directly an additional 100,000 shares and to make possible "such other steps as we think might be advisable." The Circuit Court for Macomb County, State of Michigan, ordered Briggs to open its shareholder list to Crane. "Such other steps" consisted of two proposals filed with the Securities and Exchange Commission to be included with the proxy materials submitted to Briggs shareholders for action at the annual meeting in June, 1960. The two proposals if approved would authorize the directors to sell all of Briggs' assets to Crane and surrender its corporate franchise.

The filing of the F.T.C. complaint and the complaint in this case caused Crane to reconsider its proposals to purchase outright the assets of Briggs.

Crane then concentrated upon the election of its nominees to the Briggs Board of Directors. Between the dates of issuance of the F.T.C. complaint (March 18) and filing of its answer to this action (May 11), Crane purchased over 50,000 shares of Briggs stock at above-market prices.

Any consideration of the possible injury to Briggs by the election of Crane candidates to the Board must be viewed against the background of Crane's systematic efforts to acquire Briggs.

The climax of Crane's efforts to dominate or control Briggs will be the shareholders meeting of June 17th. Because of the cumulative voting provisions of the Michigan General Corporation Act, 21 Mich.Stat.Ann., Sec. 21.32, Comp.

3. Thus, the exception in Section 7 pertaining to stock purchases solely for investment is not applicable here. See footnote 1.

Laws 1948, § 450.32, Crane will elect at least one, and probably two, members to the Briggs Board of Directors.

Crane, apparently to avoid suspicion that its nominees would be puppets, has asked seven Briggs shareholders, none of whom is a shareholder of Crane, to be nominees for the Briggs Board. Each nominee filed an affidavit stating that Mr. T. M. Evans asked him to be a nominee for the Briggs Board of Directors but only if he would act as an impartial and independent director serving the best interests of Briggs and all of its shareholders and would not be responsible in any manner to Crane.

Of the seven nominees, none owned stock prior to August 28, 1959, which was several days after Crane commenced buying Briggs stock in the open market. Two of them purchased their shares after the filing of the complaint in this action and during or after the week in which Evans reportedly asked the seven to be nominees.

It is not denied that two and possibly even three nominees purchased Briggs stock at the suggestion of Crane in order to enable them to be nominees for the Briggs Board of Directors.

I have no reason to doubt the integrity of the Crane nominees. However, considering the history of Crane's attempts to acquire Briggs and its method of selection of several of the nominees, I find it difficult to believe Crane would support nominees who were not sympathetic to its objectives. Every decision of a Briggs director will have an immediate or remote effect upon the competitive relationship with Crane. Even if only one or two of Crane's nominees should become directors, the other directors and the management would feel the same degree of restraint in their deliberations, particularly on confidential matters, as they would if a direct representative of Crane were on the Board.

It seems to me that, since the two companies are competitors, the Briggs Board would be unable to perform its proper functions in connection with the management of the company without divulging to a competitor confidential information with respect to the development of processes and techniques; plans for improvement of products and plans for sales and promotion campaigns. See American Crystal Sugar Co. v. The Cuban-American Sugar Co., D.C.S.D. N.Y.1957, 152 F.Supp. 387, at page 394, affirmed 2 Cir., 1958, 259 F.2d 524:

"Any such representation [on plaintiff's Board of Directors] would give the nominee of defendant an opportunity to be thoroughly acquainted with the business and plans of the plaintiff company and thereby to limit the effectiveness of the competition between them."

In Hamilton Watch Co. v. Benrus Watch Co., Inc., D.C.Conn.1953, 114 F. Supp. 307, affirmed 2 Cir., 1953, 206 F. 2d 738, Chief Judge Hincks felt it unnecessary to decide whether Benrus' representative on Hamilton's Board would in fact act in a manner antagonistic to the interests of Hamilton, and said at page 314 of 114 F.Supp.:

"A director on Hamilton's board elected by Benrus would be in a position to obtain confidential information of value to Benrus as a competitor, the disclosure of which would be harmful to Hamilton and would materially impair its competitive position. In participating in the management, such a director would be subjected to frequent conflicts of loyalties involving decisions dependent upon the exercise of his judgment faculties many of which would be of such a nature that it would be impossible to demonstrate the presence or extent of the Benrus influence if that had been a factor."

It is interesting to note that the record in that case disclosed that the management of Benrus suggested to Hamilton that it was Benrus' intention to elect a director to the Hamilton Board who would be "independent" of Benrus. The District Court, however, did not even discuss Benrus' proposal.

The election of Crane nominees to the Briggs Board will make it difficult for

Briggs to deny that Crane has a role in formulating Briggs' policies, particularly in the light of the publicity relating to Crane's purchases of Briggs stock.

Affidavits disclose examples of past and probable future damage to Briggs' good will and distributor relationships. Distributors have encountered substantial resistance to the sale and promotion of Briggs' products since the acquisition plans of Crane became common knowledge. Some architects and contractors are hesitant to specify Briggs' products in contemplated buildings because of their uncertainty whether the products will be available for delivery at the time specified and at the originally quoted prices. To combat this resistance, Briggs' distributors have, in some instances, in order to maintain Briggs' business in their territories, personally assured contractors who bid on projects using Briggs' quotations that they will protect the contractors against loss in the event Crane takes over Briggs. Mr. Evans acknowledged the probable widespread repercussions in the industry resulting from Crane's holdings in Briggs in a letter to Briggs' president on November 10, 1959:

"Upon consideration, I think you will agree from an operating standpoint that it will disturb, to say the least, the employees and customers of Briggs when this information is made public by the S.E.C. It is our desire to minimize this as much as possible."

 Defendant, attempting to refute the plaintiff's allegation of threatened injury, argues that ownership and voting of stock in a corporation by a competitor and solicitation of proxies are lawful and entirely proper even though the ultimate objective of the competitor-shareholder may be to acquire the control or assets of the corporation. In support of its position, Crane cites the following recent cases: E. L. Bruce Co.

v. State, ex rel. Gilbert, Del.Sup.Ct.1958, 144 A.2d 533; Nationwide Corp. v. Northwestern Life Insurance Co., 1958, 251 Minn. 255, 87 N.W.2d 671; Hanrahan v. Puget Sound Power & Light Co., 1954, 332 Mass. 586, 126 N.E.2d 499; Crane Co. v. Briggs Manufacturing Co., No. 25238, Circuit Court for Macomb County, State of Michigan (1960).[4] All these cases are authority for the general proposition that there is nothing illegal or immoral in seeking new management which would be more sympathetic to a proposed merger. However, this principle is inapplicable when the voting of the stock is pursuant to a plan of merger or acquisition of assets that would violate Section 7 of the Clayton Act. As Chief Judge Hincks succinctly stated in Hamilton Watch Co. v. Benrus Watch Co., Inc., D.C.Conn.1953, 114 F.Supp. 307, at page 315:

"The defendant's right under Pennsylvania law to vote the stock must give way to the overriding policy of the anti-trust laws of the United States."

The plaintiff has shown that it is in immediate danger of irreparable injury. It must now demonstrate that there is a reasonable probability of a violation of Section 7 of the Clayton Act. Hamilton Watch Co. v. Benrus Watch Co., Inc., supra; American Crystal Sugar Company v. The Cuban-American Sugar Company, D.C.S.D.N.Y.1956, 143 F.Supp. 100; United States v. Brown Shoe Company, Inc., CCH 1956 Trade Cases ¶ 68,244 (E.D.Mo.1956); E. L. Bruce Company v. Empire Millwork Corporation, D.C.S.D.N.Y.1958, 164 F.Supp. 446.

### Section 7 of the Clayton Act

A. *Policy of Section 7 of the Clayton Act.*

 A motion for a preliminary injunction is not the place for an extended discussion of the philosophy of competi-

---

4. The Michigan Circuit Court specifically left open the question whether Crane's *action violated the antitrust laws*, stating that if Crane in securing proxies might lessen competition, the United States courts were present to correct, the situation.

tion and the significance of Section 7 as amended. Suffice it to say that Section 7 is designed to reach beyond the Sherman Act and arrest undue concentration of economic power or monopolistic tendencies in their incipiency. See S.Rep. No. 1775, 81st Cong. 2nd Sess. (1950); Report of the Attorney General's National Committee to Study the Antitrust Laws (1955), pages 115–118; United States v. Bethlehem Steel Corporation, D.C.S.D.N.Y.1958, 168 F.Supp. 576, 583; Hamilton Watch Co. v. Benrus Watch Co., 2 Cir., 1953, 206 F.2d 738, 741.

B. *Relevant Market.*

 The phrase in Section 7 "in any line of commerce in any section of the country" requires a delineation of relevant product and geographic markets.

The Supreme Court has defined generally a product market as follows:

"* * * sufficient peculiar characteristics and uses to constitute them products sufficiently distinct from all other finishes and fabrics to make them a 'line of commerce' within the meaning of the Clayton Act." United States v. E. I. du Pont de Nemours & Co., 1957, 353 U.S. 586, 593–594, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057. (This case arose prior to the 1950 amendment to Section 7 but the requirement of "line of commerce" is present in both the original and amended versions.)

Like many abstract declarations this definition is sometimes difficult to apply in a particular instance. However, Judge Weinfeld in a well-considered opinion in United States v. Bethlehem Steel Corporation, supra, carefully analyzed the concept of a "line of commerce" and held that an entire industry and also certain lines of products within that industry could be lines of commerce in which a merger would substantially lessen competition.

In this case Briggs contends that the "lines of commerce" are: bathtubs, sinks, lavatories, fountains and cuspidors, urinals, water closets and plumbing fittings products. However, Crane classifies the "lines" as vitreous china products; enameled steel products and products which Briggs does not manufacture, such as enameled cast iron products.

At this stage of the proceedings it would seem under the reasoning of United States v. E. I. du Pont de Nemours & Co., supra, United States v. Bethlehem Steel Corporation, supra, and United States v. Brown Shoe Company, D.C. E.D.Mo.1959, 179 F.Supp. 721, that there are lines of commerce within which parties compete, for purposes of a Section 7 action, although the exact nature and extent cannot be determined at this time.

Another aspect of the relevant market is the geographical delineation both on the manufacturing and distributing levels. The language of Section 7, "any section of the country," means that certain areas of the United States may constitute effective areas of competition. American Crystal Sugar Company v. The Cuban-American Sugar Company, D.C. S.D.N.Y.1957, 152 F.Supp. 387, 389, affirmed 2 Cir., 1958, 259 F.2d 524; United States v. Bethlehem Steel Corporation, supra; and United States v. Brown Shoe Company, supra.

In this case both plaintiff and defendant manufacture their products for distribution throughout the entire country although the precise areas within which the parties compete within the line of commerce cannot be determined at this time.

On the distribution level Briggs and Crane compete for the business of wholesale distributors. Briggs' sales are usually made to over five hundred independent wholesale distributors throughout the country who occasionally also handle products of Crane and other companies. The distributors are located in cities of over 25,000 in population but also service the near-by communities. Briggs also sells to large chain store outlets. Crane distributes through independent wholesalers and company-held outlets.

It is evident that at the production and distribution levels there are geographical

areas within which the two firms compete.

C. *Effect of the Challenged Acquisition Upon Competition in the Relevant Market.*

■ Section 7 includes within its scope a percentage interest sufficient to elect nominees to the Board of Directors. Hamilton Watch Co. v. Benrus Watch Co., D.C.Conn.1953, 114 F.Supp. 307 (defendant owned 25 per cent of the plaintiff's shares) and American Crystal Sugar Company v. The Cuban-American Sugar Company, supra (defendant controlled 23 per cent). Congress' purpose was to prevent possible injuries to competition in the incipient stage; it is consistent with that policy to hold that the application of Section 7 turns on the probable effects upon competition by the acquisition of stock in one corporation by another, rather than on the numerical percentage of voting control acquired.

■ The crucial issue becomes whether Crane's proposed acquisition of Briggs may substantially lessen competition within the relevant market. I adopt the reasoning in Pillsbury Mills, Inc., F.T.C. Docket 6000 (1953), that market share is only one of several factors to be considered in finding a *prima facie* violation of Section 7. A showing that the merging corporations do a large dollar volume of business or that the corporations' share of the market would, of necessity, increase in a horizontal merger (combinations of competitors) does not alone violate Section 7, for that provision is concerned with the prospective effect upon a lessening of competition. However, the market share in which competition is eliminated should be at least a starting point for any examination of possible lessening of competition and indeed is an element of considerable importance.

Some of the factors indicating a substantial lessening of competition are listed in H.R.Rep. No. 1191, 81st Cong. 1st Sess. (1949) p. 8, and ·cited in United States v. Bethlehem Steel Corporation, D.C.S.D.N.Y.1958, 168 F.Supp. 576, at page 603:

"There may be a substantial lessening of competition or tendency to monopoly when a merger substantially increases concentration, eliminates a substantial factor in competition, eliminates a substantial source of supply, or results in the establishment of relationships between buyers and sellers which deprive their rivals of a fair opportunity to compete."

In applying these criteria to the present case it is well first to examine the current state of the plumbing fixtures and supplies industry. The largest concern in the industry is American Radiator and Standard Sanitary Corporation whose sales volume is between 45 and 50 per cent of the total national dollar volume. Although there is some dispute between the plaintiff and defendant as to the classification of the relevant product market, both parties acknowledge that in the general categories of plumbing fixtures, fittings and supplies, Crane, as already stated, in 1959 accounted for nearly 10 per cent of the national total, and Briggs, 6 per cent.

Although Crane would, after the merger, have only one-third the sales volume of American Radiator and Standard Sanitary Corporation, the two corporations together would control nearly two-thirds of the entire industry.

Also, affidavits demonstrate that the manufacture of plumbing fixtures, fittings and supplies is at present conducted by approximately ten companies in the United States. No new manufacturer has entered the industry within the past ten years. If Briggs were absorbed by Crane, not only would there by an increase in concentration, but Briggs' role as a competitor and buffer to the larger corporations would be destroyed.

Crane has stated that it would absorb Briggs' manufacturing facilities into its own organization thereby effectively removing from the industry a substantial independent supplier of plumbing fixtures, fittings and supplies.

Affidavits indicate that the acquisition would eliminate or reduce the activities

of many of the independent distributors competing with Crane's company-operated outlets.

All these considerations, though each by itself is not determinative of the issue, together form a composite picture of the probable effects upon competition in the industry resulting from Crane's acquisition of Briggs, and, in making this determination, I am not unmindful of Crane's argument that the record is insufficient at this period of the litigation to establish the relevant market and the effect upon competition. Crane stresses that more complete data as to price differentials, interchangeability of products, actual competition between Crane and Briggs in certain areas of the country, and general competitive conditions in the industry are needed. The answer to all of this is set out in the words of Judge Frank in Hamilton Watch Co. v. Benrus Watch Co., 2 Cir., 1953, 206 F.2d 738, at page 740:

> "To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i. e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation."

I have not overlooked the cases cited by the defendant in which a preliminary injunction was denied: E. L. Bruce Company v. Empire Millwork Corporation, D.C.S.D.N.Y.1958, 164 F.Supp. 446; American Crystal Sugar Company v. The Cuban-American Sugar Company, D.C. S.D.N.Y.1958, 143 F.Supp. 100, and United States v. Brown Shoe Company, CCH 1956 Trade Cases ¶ 68,244 (E.D. Mo.1956). (In the latter two cases a permanent injunction was issued after a trial on the merits. American Crystal Sugar Company v. The Cuban-American Sugar Company, D.C.S.D.N.Y.1957, 152 F.Supp. 387, affirmed 2 Cir., 1958, 259 F.2d 524; United States v. Brown Shoe Company, D.C.E.D.Mo.1959, 179 F.Supp. 721.) In the Bruce case the two combining corporations controlled 12 per cent of the total sales volume, but there were approximately 170 other companies in the industry. There was no showing of any added concentration in the industry or reduction in competitive vigor or any difficulty of entrance into the industry. Thus, that Court followed the Pillsbury doctrine, as has this Court, in holding that no one pattern of proof, such as market share, is the ultimate factor. In the Brown Shoe case, the Government in support of its motion, submitted only two affidavits whose entire content consisted of a comparison of figures for the sales and production of the merging companies and the industry. (Both companies wished to merge but the United States Government objected.) Furthermore, the Government cited no cases to support its position and the Court stated, " * * * we have found none." Unlike the situation in the Brown Shoe case, the present case is one in which sufficient evidence was submitted on the probable effects of the merger upon competition. In American Crystal Sugar case the conclusion was reached without indicating many of the factors prompting the decision, although the Court stated that if immediacy of harm to the plaintiff were demonstrated it might have granted the injunction merely on an initial showing of "quantitative substantiality."

I hold that there is a reasonable probability of a violation of Section 7 of the Clayton Act.

However, before granting injunctive relief, I must still "balance the equities."

The main thrust of Crane's argument on comparison of the relative hardships to the parties is that it would be inequitable to prevent the Briggs shareholders from voting either on a proposed merger with Crane or for independent directors who would provide more dynamic leadership in the industry. Crane points

to Briggs' declining financial situation[5] and states that perhaps many shareholders would prefer to become part of the Crane business. In any event, defendant argues that should the shareholders prefer Crane's influence, no irreparable harm would result, for an order of divestiture would effectively restore the corporations to their prior separate competitive positions should the trial on the merits disclose a violation of Section 7.

It should be obvious, however, that if Briggs is not protected now, even though it prevails on the ultimate determination, such victory would be useless for Briggs and the public. Crane has stated it wishes Briggs' plants and assets solely to improve its own manufacturing and supply facilities. As for the period required for a final determination of the issues here, this Court by a divestiture decree may be unable to repair effectively the damage done to Briggs' employees and distributors by Crane in furtherance of its avowed plans to absorb Briggs. It is doubtful that Briggs could reactivate itself as a vigorous independent competitive entity.

It is difficult to pinpoint the exact injury Crane will suffer by the granting of the injunction. It is possible that Crane's stockholdings, viewed as an investment, might decline in value. As stated before, however, Crane did not purchase the stock for investment purposes and, indeed, to obtain blocks of stock, sometimes paid a higher than market price. In the meantime, Crane could continue its present manufacturing and distributorship policies without any material hardship. If Crane were to prevail on the trial, it would be in a position, if it still desired, to consummate the merger.

The preliminary injunction will be issued and the parties may submit forms of the order for signature. A bond will be set by the Court at that time.

Such order shall restrain Crane Co., its officers, agents, nominees and all persons or corporations acting in its behalf, until further order of this Court, from: (1) soliciting proxies from other Briggs shareholders; and (2) from voting directly or indirectly the shares of Briggs Manufacturing Company's common stock which is now owned or hereafter acquired by Crane Co., or held or hereafter acquired by any such officers, agents, nominees or other persons or corporations on Crane's behalf, at the annual meeting of shareholders of the Briggs Manufacturing Company, which is scheduled for June 17, 1960, or at any meeting which constitutes a continuance or an adjournment of the meeting which is scheduled for June 17, 1960, or at any other meeting of Briggs Manufacturing Company shareholders.

---

5. Gross revenue decreased from $29,388,-900 in 1955 to $17,636,000 in 1958, but increased to $21,502,000 in 1959. Briggs reported losses for 1957 and 1958 but earned a net profit after taxes of $365,-908 in 1959. There have been no dividends paid to shareholders since 1956. Between 1955 and 1959 working capital has declined by over $5,000,000 and $3,-360,000 is still owing on short-term notes and a mortgage loan.