VANADIUM CORPORATION OF AMERICA, Plaintiff,

v.

The SUSQUEHANNA CORPORATION and H. M. Byllesby & Company, Defendants.

Civ. A. No. 2412.

United States District Court
D. Delaware.

Feb. 26, 1962.

---

Aaron Finger, Richards, Layton & Finger, Wilmington, Del., and Charles Pickett, Lee B. Morey, Edward R. Neaher, and Chadbourne, Parke, Whiteside & Wolff, New York City, for plaintiff.

Arthur G. Logan, Logan, Marvel, Duffy & Boggs, Wilmington, Del., Emil N. Levin, Friedlund, Lavin & Friedlund, Chicago, Ill., and Edward Tait, William W. Rayner and Gravelle, Whitlock, Markey & Tait, Washington, D. C., for defendants.

LEAHY, Senior District Judge.

Plaintiff seeks an injunction pendente lite.[1] This memorandum is filed in compliance with F.R.Civ.P. 52(a), 28 U.S. C. The action arises under Sections 4, 7, and 16 of the Clayton Act and 28 U. S.C. § 1337 to enjoin alleged violations of § 7 of the Clayton Act and § 1 of the Sherman Act.[2]

Plaintiff, Vanadium Corporation of America, and defendants, The Susquehanna Corporation and H. M. Byllesby & Company, are Delaware corporations.[3] Plaintiff is engaged in mining and purchasing ores containing vanadium and uranium and in producing and selling such products.[4]

The principal use of vanadium is in the steel and iron industry. In various forms, vanadium is added to steel, cast iron and other metallic products where special qualities, such as high strength and good resistance to fatigue, are desired. Certain vanadium products are also used in preparing chemical compounds and catalysts.[5] Uranium is another rare metallic element, which is vital to national defense.[6] Both vanadium and uranium are found in ores. Foreign

---

1. Plaintiff's motion for a preliminary injunction was heard February 17, 1962 on the basis of the verified complaint and the plaintiff-affidavits of Keeley, Weissenburger, Shriver and Floyd, together with the exhibits; defendants' affidavits of Gray and Whitney; together wtih oral argument of counsel and briefs of the parties.

2. 15 U.S.C.A. §§ 18, 15, 26; 15 U.S.C.A. § 1.

3. Complaint and Ans. ¶ 1.

4. Complaint ¶ 4; Susquehanna Ans. ¶ 2; Shriver, ¶ 8.

5. Shriver, ¶ 9; Complaint ¶ 9; Susquehanna Ans. ¶ 9.

6. Shriver, ¶ 10.

ores were formerly an important source of the vanadium consumed in the United States. For many years, however, imports of vanadium ores or vanadium products into the United States have been minor.[7]

For many years, the principal United States source of vanadium has been the carnotite and roscoelite ores found in the Colorado Plateau area, which comprises chiefly southwestern Colorado and southeastern Utah, but also extends into Arizona and New Mexico. The vanadium-bearing ores found in that area are also a principal source of uranium. To a lesser extent, vanadium is found in the United States in other minerals, such as phosphate rock.[8] In 1939, plaintiff began vanadium mining and milling operations in the United States. Previously, it had been engaged abroad in such operations since 1919. Since 1955, plaintiff's vanadium mining and milling operations have been confined to the United States.[9] Plaintiff owns or leases a number of vanadium-uranium mines and properties in and around the Colorado Plateau area. Most of the vanadium ores used by plaintiff have been obtained from those properties. In addition, plaintiff has purchased vanadium ore from other ore miners.[10]

In the United States, vanadium-bearing and uranium-bearing ores contain small percentages of the elements. To obtain marketable products, the vanadium and uranium must be extracted from the ores. The ores are taken to mills where concentrates of vanadium and uranium are produced.[11] For several years, plaintiff has been producing its vanadium concentrates and uranium concentrates at its mill at Durango, Colorado. The plant has a practical production capacity of 4,700,000 pounds of vanadium oxide a year. In addition, plaintiff owns and operates a beneficiating plant at Naturita, Colorado, to treat vanadium-uranium ores prior to concentration at the Durango mill.[12]

Vanadium concentrates are often called vanadium pentoxide ($V_2O_5$) or vanadium oxide. Uranium concentrates are often called uranium oxide ($U_3O_8$).[13] Both vanadium concentrates are marketable commodities. Almost all the uranium concentrates produced in the United States are sold, without further processing, to the Atomic Energy Commission.[14] A considerable part of the vanadium concentrates or pentoxide produced in the United States has been sold without further processing. Foreign steel and iron producers often use vanadium oxide directly. Substantial quantities of vanadium pentoxide are exported from the United States for use in steel making or for conversion into other vanadium products.[15]

Most American steel and iron producers prefer not to use vanadium concentrates or pentoxide, but a form of vanadium that has been processed further, called ferrovanadium. The principal use of vanadium pentoxide in the United States is to produce ferrovanadium. Vanadium concentrates or pentoxide are converted into ferrovanadium by various thermic processes. Vanadium is used in the United States principally in the form of ferrovanadium.[16] For several years, plaintiff has been producing Ferrovanadium at its plant at Cambridge, Ohio, and it has been made in part from vana-

---

7. Shriver, ¶ 11, 13; Complaint ¶ 9, last sentence, admitted in Susquehanna Answer, ¶ 9.

8. Shriver, ¶ 14; Comp. ¶ 7, 8, admitted in Susquehanna Ans. ¶ 7, 8.

9. Shriver, ¶ 3, 12, 13.

10. Shriver, ¶ 15.

11. Shriver, ¶ 11; Comp. ¶ 8, second sentence, admitted in Susquehanna Answer, ¶ 8.

12. Shriver, ¶ 15, 17; Shriver Supp., ¶ 7.

13. Shriver, ¶ 16.

14. Shriver, ¶ 18; Comp. ¶ 8, last sentence, admitted in Susquehanna Ans. ¶ 8.

15. Shriver, ¶ 19; Comp. ¶ 9, admitted in Susquehanna Ans. ¶ 9.

16. Shriver, ¶ 18, 19, 21; Comp. ¶ 9, admitted in Susquehanna Ans. ¶ 9.

dium concentrates shipped from plaintiff's mill at Durango, Colorado, and in part from vanadium pentoxide produced by other concerns and purchased by plaintiff.[17]

Plaintiff is and for many years has been a substantial purchaser of vanadium pentoxide produced by others. In the five year period from 1956 through 1960, plaintiff bought about 5,187,000 pounds of vanadium pentoxide, an average of 1,037,000 pounds a year. The bulk was purchased from another producer and 1,581,000 pounds were purchased from the Atomic Energy Commission. During 1961, plaintiff bought about 948,000 pounds of vanadium pentoxide to supplement its own production of about 3,200,000 pounds. None of the vanadium pentoxide bought by plaintiff was purchased from Susquehanna or any subsidiary of Susquehanna.[18]

The ferrovanadium produced by plaintiff is sold largely to steel and iron producers located in various places in the United States. Plaintiff maintains offices in Wilmington, Delaware, and New York City, and district offices in several other cities, including Chicago, Cleveland, Detroit, and Pittsburgh.[19] In addition to producing ferrovanadium at its plant at Cambridge, Ohio, plaintiff has also produced there another processed vanadium product called ammonium metavanadate. It is used principally in the manufacture of catalysts to produce synthetic fibers and sulphuric acid.[20]

Plaintiff for many years has been either the largest or second largest producer of vanadium products in the United States. It is the largest producer of vanadium products for consumption in the United States.[21] During the five year period from 1956 through 1960, plaintiff supplied 52.95% of the total vanadium consumed in the United States. Of the vanadium products consumed in the United States in that period, plaintiff sold about 77.45% of the vanadium oxide and 55.8% of the ferrovanadium.[22] Of the vanadium products consumed in the United States in 1960, plaintiff sold about 46% of the total consumption, 83% of the vanadium pentoxide and 48% of the ferrovanadium. Of the vanadium products consumed in the United States in the first eleven months of 1961, plaintiff sold about 46% of the total consumption, about 53% of the vanadium pentoxide and about 51% of the ferrovanadium.[23]

Most of plaintiff's vanadium products have been sold in the United States but its export business has also been substantial. During the five year period from 1956 through 1960, plaintiff's exports of vanadium in all forms amounted to 21.01% of the total vanadium ore, concentrates, pentoxide and other vanadium products exported from the United States.[24]

The vanadium industry in the United States is, and for decades has been, highly concentrated. There are very few producers of vanadium products in the United States.[25] There are only two producers in the United States of a full line of vanadium products. Plaintiff is and for many years has been one of those producers, which are sometimes called "fully integrated" producers.[26]

Since about 1927, when the corporation presently called Union Carbide Corporation ("Union Carbide") entered the vanadium industry, that corporation and plaintiff have been (except for a few years) the only United States producers of a full line of vanadium products.[27] Just prior to and during World War II,

17. Shriver, ¶ 21, 22.

18. Shriver, ¶ 22, 41, 42; Shriver Supp. ¶ 8, 9; Comp. ¶ 12, third sentence, admitted in Susquehanna Ans. ¶ 12.

19. Shriver, ¶ 3, 23.

20. Shriver, ¶ 24, 25.

21. Shriver, ¶ 25.

22. Shriver, ¶ 36–39.

23. Shriver, ¶ 36–39; Exs. B, D, E; Shriver Supp. ¶ 6.

24. Shriver, ¶ 40.

25. Shriver, ¶ 25–34.

26. Shriver, ¶ 25, 26, 33, 34.

27. Shriver, ¶ 26.

concerns other than plaintiff and Union Carbide established vanadium oxide mills in the United States. Those mills closed after the Government's wartime vanadium procurement program ended.[28] About 1947, the Atomic Energy Commission began a program to increase domestic uranium output. As a result of that program, many concerns went into the production of uranium concentrates, particularly on or near the Colorado Plateau where vanadium-uranium ores are found.[29] As of December 31, 1959, there were 25 uranium processing plants in this country, with a total capacity of 22,500 tons of ore per day. Plaintiff's Durango plant has a capacity of 750 tons of uranium ore per day.[30] Of the new uranium producers, only two went into the production of vanadium concentrates as well as uranium concentrates prior to Susquehanna's entry into the vanadium and uranium industries. One mill producing both vanadium oxide and uranium oxide was built by Climax Uranium Company, now a division of American Metal Climax, Inc., and another by Kerr-McGee Oil Industries, Inc. Both companies have produced vanadium oxide, but neither has processed it into ferrovanadium.[31]

Until defendant Susquehanna entered the vanadium industry, plaintiff and Union Carbide produced and sold most of the vanadium consumed in the United States and, together with Climax Uranium Company and Kerr-McGee Oil Industries, Inc., produced practically all the vanadium oxide made in the United States. No steel company has undertaken to manufacture vanadium products.[32]

Defendant Susquehanna is a holding company. Its vanadium and uranium operations have been conducted through wholly-owned subsidiary corporations.[33] For several years, Susquehanna has been expanding its activities. It has a strong financial position and substantial cash resources with which to expand its business.[34] Susquehanna expanded into the uranium industry before it entered the vanadium industry. Its wholly-owned subsidiary named Mines Development, Inc., has been operating a uranium processing mill at Edgemont, South Dakota, since 1956. Through wholly-owned subsidiaries, Susquehanna now operates three uranium processing mills with an aggregate rated daily capacity of 1,100 tons of uranium ore.[35]

After entering the uranium industry, Susquehanna constructed vanadium plants. One such plant was constructed in 1960 at Edgemont, South Dakota, at a cost of about $750,000. It produces vanadium pentoxide from the vanadium occurring in certain uranium ores. It has a design capacity of 800,000 pounds of vanadium products annually.[36] Prior to completion of its Edgemont vanadium plant, Susquehanna took the second step in its vanadium program. It acquired and equipped a vanadium plant at Salt Lake City, Utah, which its wholly-owned subsidiary owns. The plant is operated under a joint venture of which Susquehanna receives 50% of the profits. Susquehanna is the managing partner of the joint venture.[37]

The Salt Lake City plant produces vanadium pentoxide by reprocessing phosphate furnace slag which contains vanadium. It began production of vanadium pentoxide in July 1961. Within a year, it will produce 2,000,000 pounds of vanadium pentoxide annually.[38] The

28. Shriver, ¶ 26–30.

29. Shriver, ¶ 32–33.

30. Shriver, ¶ 43.

31. Shriver, ¶ 33, 34.

32. Shriver, ¶ 34; Floyd, ¶ 9.

33. Complaint, ¶ 2, 6; admitted in Susquehanna Ans., ¶ 2, 6; Gray, ¶ 1, 3, 4.

34. Shriver, ¶ 48, 52, 61; Keeley, ¶ 21.

35. Shriver, ¶ 50; Gray, ¶ 4.

36. Shriver Supp., ¶ 3, Ex. I, p. 16; Weissenburger Supp., ¶ 14, Ex. 1, reverse side; Gray, ¶ 15.

37. Shriver, ¶ 55, 59; Floyd, ¶ 7; Gray, ¶ 18, 19.

38. Shriver, ¶ 54; Shriver Supp., ¶ 3, Ex. I, p. 16; Weissenburger Supp., ¶ 13; Floyd, ¶ 3, 7.

combined production capacity of the Edgemont and Salt Lake City plants of Susquehanna will be about 2,800,000 pounds of vanadium pentoxide a year. That amount is about 20% of the total United States production of vanadium pentoxide in 1959, and about 13.3% of the entire estimated United States production of 21,108,900 pounds of vanadium pentoxide in 1961.[39]

Defendant Susquehanna has also made plans to produce vanadium at another plant, at Riverton, Wyoming, which can be readily converted to vanadium production.[40] Defendants have not disclosed the total production or sales of vanadium products by Susquehanna. During 1961, when its vanadium plants were not yet in full operation, they made sales to customers in the United States of about 109,000 pounds. The sales to foreign customers were not revealed.[41] Susquehanna was during 1961 and is engaged in competition with plaintiff in the sale of vanadium pentoxide in interstate and foreign commerce. Potentially the competition in vanadium products between plaintiff and Susquehanna, in interstate and foreign commerce, is very substantial.

The vanadium industry, and vanadium products, are distinctive and sufficiently distinct from all other products to make them a line of commerce.[42]

Byllesby is engaged in the investment banking business. Plaintiff, here, charges that Byllesby and Susquehanna have been acting in concert to acquire control of plaintiff for the purpose of bringing about a merger or other union of interest between plaintiff and Susquehanna.

Byllesby owns 20% of Susquehanna's stock. Together, Byllesby and members of Susquehanna's Board of Directors, and their immediate families, own 38% of Susquehanna's common stock.[43] Byllesby's Board of Directors consists of 10 members, of whom 5 are also members of Susquehanna's 15-member Board of Directors. Four of the Byllesby directors comprise the Executive Committee of Susquehanna.[44]

J. Patrick Lannan is the Chairman of the Board and President, and a member of the executive Committee and a director, of Susquehanna. He is also Chairman of the Executive Committee and a director of Byllesby.[45] Plaintiff alleges he has been the prime mover in attempts by defendants to bring about a merger between Susquehanna and plaintiff.[46]

Plaintiff is a publicly held company. It has issued and outstanding 1,431,807 shares of common stock with unrestricted voting power, and 40,000 shares of preferred stock with restricted voting rights.[47] Plaintiff's common stock, listed on the New York Stock Exchange, is widely held by about 7,100 stockholders. The largest single individual (as distinguished from corporate) stockholder of plaintiff is its President, who personally owns 17,705 shares of plaintiff's common stock and over 4,100 shares of its preferred stock. The interests he represents own about 44,000 shares of plaintiff's common stock and 12,000 shares of its preferred stock.[48]

About October 1960, defendants' Lannan stated he was interested in taking a major interest in plaintiff's stock. Thereafter defendants began to buy

39. Shriver, ¶ 54, 58, 59; Shriver Supp., ¶ 3, Ex. I, p. 16; Weissenburger Supp., ¶ 13; Floyd, ¶ 3, 7.

40. Weissenburger Supp., ¶ 21–22; Floyd, ¶ 4–6.

41. Gray, ¶ 20.

42. Shriver, ¶ 48, 55, Ex. I, pp. 1, 3, Ex. II, p. 2; Shriver Supp., ¶ 3, Ex. I, pp. 4, 16; Shriver Supp., ¶ 4, 5; Ex. II, Ex. III.

43. Shriver, ¶ 47; Shriver Supp., ¶ 3; Ex. I, p. 5, ¶ 9.

44. Complaint, ¶ 3, admitted in Answers, ¶ 3; Shriver, ¶ 55; Ex. I, page preceding p. 1; Shriver Supp., ¶ 2.

45. Keeley, ¶ 2; Complaint, ¶ 3, admitted in Byllesby Ans. # 3.

46. Keeley, ¶ 3–20; Weissenburger Supp., ¶ 8.

47. Shriver, ¶ 6.

48. Shriver, ¶ 6; Weissenburger Supp., ¶ 2.

stock of plaintiff. Initially that stock was registered in nominees' names. Subsequently stock was registered in defendants' names.[49] In April 1961, Lannan stated he and his associates owned 18% of plaintiff's stock. By the end of April 1961, Susquehanna admittedly had bought about 140,000 shares of plaintiff's common stock.[50] In May 1961, Lannan proposed an immediate merger between plaintiff and Susquehanna, with the latter the surviving corporation. Later that proposal was reiterated frequently.[51] Toward the end of May 1961, Lannan offered to purchase up to 50,000 shares of plaintiff's stock from the interests represented by its President. That offer was subsequently rejected.[52]

Defendants were well aware of the anti-trust dangers threatened by merger between Susquehanna and plaintiff. Lannan admitted his lawyers were afraid of such a merger because they thought it would involve anti-trust problems.[53]

By September 13, 1961, according to Lannan, Susquehanna and related interests owned 19.7% of plaintiff's stock.[54]

At a meeting held on September 13, 1961, dealing with the proposed merger between plaintiff and Susquehanna, Lannan stated if it were necessary to acquire 30%, 40% or 51% of plaintiff's stock, he would do so and "take plaintiff over." He added he was able, and expected to do so. When someone raised the point that such a merger could violate the anti-trust laws, he replied that business men should be prepared to take business risks.[55] The proposal to merge plaintiff into Susquehanna with defend-

ants' support was given publicity in the Wall Street Journal, other publications and a report by Susquehanna to its stockholders.[56]

As of December 31, 1961, Susquehanna was the holder of record of 140,000 shares of plaintiff's common stock. That amount was just under 10% of plaintiff's common stock. Susquehanna was the largest single stockholder of record of plaintiff.[57]

Byllesby continued purchasing plaintiff's stock throughout 1961. It states its last purchase was made on December 31, 1961. As of that date, Byllesby was the holder of record of 3,765 shares of plaintiff's common stock. As of February 14, 1962, Byllesby was the holder of record of 36,115 shares of plaintiff's common stock. It has not disclosed how many shares of plaintiff's stock it owns.[58]

Since October 16, 1961, a total of 25,300 additional shares of plaintiff's stock have been transferred into the names of others connected in one way or another with Byllesby and Susquehanna.[59]

In 1960 and the first three quarters of 1961, plaintiff lost money. It was faced with large potential liabilities in anti-trust treble damage actions brought against it.[60] Notwithstanding their knowledge of those facts, defendants bought large quantities of plaintiff's stock.[61] Plaintiff alleges defendants acquired plaintiff's stock to bring about a closer relationship between Susquehanna and plaintiff, either by merger or common control. Defendants, plaintiff charges, did not acquire plaintiff's stock solely for investment but for the primary

---

49. Keeley, ¶ 2–6; Shriver, ¶ 6.

50. Keeley, ¶ 6; Susquehanna Answer, ¶ 16.

51. Keeley, ¶ 6–9.

52. Keeley, ¶ 7–10; Weissenburger Supp., ¶ 5.

53. Keeley, ¶ 12; Weissenburger, ¶ 3.

54. Keeley, ¶ 13.

55. Keeley, ¶ 13; Weissenburger, ¶ 4, 5; Weissenburger Supp. ¶ 9.

56. Keeley, ¶ 14, 17–19; Exs. A, C.

57. Shriver, ¶ 6.

58. Byllesby Answer, ¶ 16; Shriver, ¶ 6; Shriver Supp. ¶ 10.

59. Shriver Supp. ¶ 10–12.

60. Continental Ore Co. v. Union Carbide and Carbon Corp., 368 U.S. 886, 82 S.Ct. 141, 7 L.Ed.2d 87 (1961), granting cert., 9 Cir., 289 F.2d 86; Union Carbide and Carbon Corp. v. Nisley, 10 Cir., 300 F.2d 561 (Dec. 7, 1961).

61. Shriver, ¶ 66–75; Shriver Supp., ¶ 13–19; Keeley, ¶ 5.

purpose of obtaining control of plaintiff. The achievement of their purpose could be reasonably probable. They could probably pursue their purpose until they acquire actual working control of plaintiff, if they do not already have it. In passing, it may be noted defendants have already taken steps to oust plaintiff's present board of directors at the forthcoming annual meeting of plaintiff's stockholders on April 19, 1962, and elect a new board of directors. Defendants plan to vote the stock of plaintiff, which they have acquired, at that meeting.[62]

Whether any merger, common control or other union of interest between plaintiff and Susquehanna would result in further concentration in the highly concentrated vanadium industry, and whether it would eliminate all competition, present and prospective, between Susquehanna and plaintiff, and whether it would probably substantially lessen competition in the sale of vanadium products throughout the United States where those products are sold and consumed, raise serious questions affecting the prohibitions of the antitrust statutes. For example, in the event of a merger, common control or other union of interest between plaintiff and defendant Susquehanna, the latter would be in a position to require, and probably could require, plaintiff to purchase vanadium oxide from it rather than outside sources. In such event, Susquehanna could probably foreclose a substantial portion of the vanadium oxide market in this country which is presently supplied by other producers. The caveat is obvious there is a reasonable likelihood that defendants' acquisition of plaintiff's stock could result in the substantial lessening of competition, and might tend to create a monopoly, in the vanadium industry in interstate commerce in the United States.

The prospects of a merger of plaintiff into Susquehanna appears to have caused unrest and uncertainty among plaintiff's customers, distributors and suppliers. The morale of plaintiff's employees may be said to have been affected adversely by defendants. Plaintiff's good will and business relationships may be irreparably damaged by defendants' acts.[63]

If defendants obtain full control of plaintiff, they will have full access to all plaintiff's plans, programs and confidential information. It is doubtful plaintiff could thereafter reactivate itself as a vigorous competitive entity, even if plaintiff were ultimately successful in resisting merger after the district and appellate courts have spoken.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction. Section 7 of the Clayton Act, as amended in 1950,[64] was expanded.[65] Prior to 1950, the statute was confined to stock acquisitions and did "not forbid the acquirement of property, or the merger of corporations pursuant to state laws."[66] But the amendment extended the reach of the statute to "assets"[67] and the broadened

62. Keeley Supp., ¶ 2, Ex. D; Shriver Supp., ¶ 20.

63. Keeley, ¶ 22–24; Weissenburger, ¶ 7.

64. Prior to 1950 the statute had received rather restrictive interpretations. Federal Trade Commission v. Western Meat Co., 272 U.S. 554, 47 S.Ct. 175, 71 L. Ed. 405 (1926); International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930); Arrow-Hart & Hegeman Elec. Co. v. Federal Trade Commission, 291 U.S. 587, 54 S.Ct. 532, 78 L.Ed. 1007 (1934).

Although decided in 1957, United States v. E. I. DuPont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057, involving the statute as it read prior to the 1950 amendment, marked a change in judicial attitude from the former restrictive interpretations.

65. See, e. g., American Crystal Sugar Co. v. Cuban-American Sugar Co., 2 Cir., 259 F.2d 524, 526–527; United States v. Bethlehem Steel Corp., S.D.N.Y., 168 F. Supp. 576, 582–583; United States v. Brown Shoe Co., E.D.Mo., 179 F.Supp. 721, 728; probable jurisdiction noted, 363 U.S. 825, 80 S.Ct. 1595, 4 L.Ed.2d 1521.

66. Arrow-Hart & Hegeman Electric Co. v. Federal Trade Commission, supra.

67. Maryland and Virginia Milk Producers Assn., Inc. v. United States, 362 U.S. 458, 468–469, 80 S.Ct. 847, 4 L.Ed.2d

statute applies to all mergers "which may substantially lessen competition 'in any line of commerce in any section of the country'." [68] Moreover, under old § 7, courts tended to require a finding of substantial competition between the acquiring and acquired corporations.[69] The 1950 amendments, emasculating the former narrow constructions, deleted all reference to competition between the corporations involved.[70] The current test is not the "impact on competition between the corporations involved" but "the proper test is one of *qualitative* substantiality of the resulting effect on competition in the relevant market," [71] or, as the Supreme Court has said: "We hold that any acquisition by one corporation of all or any part of the stock of another corporation, *competitor or not,* is within the reach of the section whenever the reasonable likelihood appears that the acquisition will result in a restraint of commerce or in the creation of a monopoly of any line of commerce." [72] And, § 7 covers vertical as well as horizontal acquisitions or integrations.[73]

■ The basic tests of illegality under new § 7 are now established. Its "aim was primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil, which may be at or any time after the acquisition, depending upon the circumstances of the particular case." [74] As our Court of Appeals has said, one of the purposes is to "nip monopoly in the bud." [75] And § 7 in its new dress was "designed to halt in their incipiency undue concentrations of economic power or monopoly." [76] § 7 now applies if the effect of acquisition "may be" to lessen competition or tend to create monopoly. The "may be" looks to the future and clearly competition quá competition need not have been already lessened or a monopoly actually and already created for "conduct may fall under the ban of amended § 7 before it has attained the stature of an unreasonable restraint of trade." [77]

■ Obviously, "proof of mere *possibility* of a prohibited restraint or ten-

880, affirming D.C.D.C., 167 F.Supp. 799, 802, 807.

68. Erie Sand and Gravel Co. v. Federal Trade Commission, 3 Cir., 291 F.2d 279, 281.
 See, too, Ramsberg v. American Investment Company of Illinois, 7 Cir., 231 F.2d 333; and United States v. Bethlehem Steel Corp., supra.

69. International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930); Temple Anthracite Coal Co. v. Federal Trade Commission, 3 Cir., 51 F.2d 656 (1931).

70. The legislative history is narrated in Hamilton Watch Co. v. Benrus Watch Co., 2 Cir., 206 F.2d 738, 741 (Note 5).

71. American Crystal Sugar Co. v. Cuban-American Sugar Co., supra, 259 F.2d 527.

72. United States v. E. I. DuPont De Nemours & Co., supra, 353 U.S. p. 592, 77 S.Ct. p. 876 (Italics added).

73. United States v. Bethlehem Steel Corp., supra, 168 F.Supp. pp. 582–583; United States v. Brown Shoe Co., supra, 179 F. Supp. p. 728; United States v. E. I. DuPont De Nemours & Co., supra; United States v. Maryland and Virginia Milk Producers Ass'n, Inc., supra, and affirmed

on this point, 362 U.S. 458, 468–469, 80 S.Ct. 847, 4 L.Ed.2d 880.
 See, too, United States v. Jerrold Electronics Corp., D.C.E.D.Pa., 187 F.Supp. 545, affd. 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806.

74. United States v. E. I. DuPont De Nemours & Co., supra, 353 U.S. p. 597, 77 S.Ct. p. 879.

75. Transamerica Corp. v. Board of Governors, 3 Cir., 206 F.2d 163, 169.

76. American Crystal Sugar Co. v. Cuban-American Sugar Co., supra, 259 F.2d p. 526, See also, e. g., United States v. E. I. DuPont De Nemours & Co., supra, 353 U.S. 589, 77 S.Ct. 875; Hamilton Watch Co., supra, 206 F.2d 741; Briggs Mfg. Co. v. Crane Co., D.C.E.D.Mich., 185 F.Supp. 177, 183, affd. 6 Cir., 280 F.2d 747, 749; Page v. Work, 9 Cir., 290 F.2d 323, 333; United States v. National Steel Corp., D.C.S.D.Tex., 26 F.R.D. 599, 602–603.

77. American Crystal Sugar Co. v. Cuban-American Sugar Co., supra, 259 F.2d p. 527; and United States v. Maryland and Virginia Milk Producers Ass'n, Inc., D.C. D.C., 167 F.Supp. 799, 807, affd. on this point, 362 U.S. 458, 469, 80 S.Ct. 847, 4 L.Ed.2d 880.

dency to monopoly"[78] is not enough, yet a plaintiff "is not required to establish with certitude that competition in fact will be substantially lessened."[79] "It is sufficient if the acquisition, merger, or absorption tends to lessen competition or tends to create a monopoly."[80] The test the Supreme Court[81] has said is whether a *reasonable likelihood* appears that the acquisition will result in a restraint of commerce or in the creation of a monopoly of any line of commerce."

It appears there can be a corporate violation of § 7 by the acquisition of a *part* of another corporation's stock for the statute refers to the acquisition of "the whole or any part" of the stock or other capital share.[82] Acquisition of less than control may still bear the stigma.[83] As Judge Frank wrote: "Purchases thus unlawfully made do not cease to be unlawful—so as to preclude an order of divestment—because the purpose is balked."[84] And, in one instance, "no merit" existed in the contention a suit that had been brought was premature "because defendants do not have, or control, sufficient stock-interest in plaintiff-company to control its Board of Directors."[85]

■ In the case at bar there can be no serious contention "a line of commerce" is not involved. All that is necessary is to "ascertain and find a product line" that is "sufficiently inclusive to be meaningful in terms of trade realities."[86] In fact, in the recent Sherman Act case of Union Carbide & Carbon Corp. v.

Nisley, 10 Cir., 300 F.2d 561 [where plaintiff, here, was a defendant] Judge Murrah wrote that "the mining, processing and marketing of the finished products from vanadium ore were undoubtedly an integrated industry forming a definite part of trade and commerce, and it was undoubtedly the subject of monopolization without relationship to other competitive products."

■ Defendants' argument that "data concerning exports is irrelevant"[87] is not accepted. The corporations, engaged in battle here, are selling goods for export and as such are in "a line of commerce" in the United States. "Commerce" includes "commerce * * * with foreign nations * * *."[88] The Sherman Act includes unlawful combinations in restraint of export trade.[89] Since § 7 of the Clayton Act is intended, as stated above, to "nip monopoly in the bud," and to enable the courts to switch on the red-light against incipient Sherman Act violations, it applies to the corporations engaged here in sales for export as well as for national consumption.

■ The record before me shows not only the plaintiff's interest for protection, but also the ever-present public interest to be on guard against violations of the anti-trust statutes. This does not mean that either the corporate plaintiff, or the Court, acts as a private Attorney General in these situations. Nor does it mean the Court ignores the cases in this district and circuit which declare

78. United States v. E. I. DuPont De Nemours & Co., supra, 353 U.S. p. 598, 77 S.Ct. p. 879.

79. United States v. Bethlehem Steel Corp., supra, 168 F.Supp. p. 603.

80. United States v. Maryland and Virginia Milk Producers Ass'n, Inc., supra, 167 F.Supp. p. 807 (District Court), affd. on this point, 362 U.S. 458, 469, 80 S.Ct. 847, 4 L.Ed.2d 880.

81. United States v. E. I. DuPont De Nemours & Co., supra, 353 U.S. p. 592, 77 S.Ct. p. 876.

82. 15 U.S.C.A. § 18.

83. Hamilton Watch Co. v. Benrus Watch Co., D.C., 114 F.Supp. 307, p. 316.

84. Ibid., affd. 2 Cir., 206 F.2d 738, 740.

85. National Supply Co. v. Hillman, D.C. W.D.Pa., 57 F.Supp. 4, 7.

86. Crown Zellerbach Corp. v. Federal Trade Commission, 9 Cir., 296 F.2d 800.

87. Susquehanna Brief, p. 15.

88. 15 U.S.C.A. § 12.

89. See, e. g., United States v. Minnesota Mining & Mfg. Co., D.C.Mass., 92 F.Supp. 947, 961–962; United States v. United States Alkali Export Ass'n, Inc., D.C.S.D. N.Y., 86 F.Supp. 59.

that a party seeking a preliminary injunction must not only allege facts as to which there is no serious dispute, but must also show a reasonable probability of success upon final hearing.[90]

■ The alleged violations concern not only plaintiff-defendants here, but if established such would have significant impact on our economy. To refer to Judge Frank again: "To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after trial, be absolutely certain, wholly without doubt; if the other elements are present (i. e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, so substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." [91] "Interference at an early stage, if possible, seems the paramount aim." [92]

2. The potential lurks here defendants may have violated, or are threatening to violate, § 7 of the Clayton Act (15 U.S.C.A. § 18), as amended, by acquiring the stock of plaintiff.

3. Under the paper record shown here, control by defendants of plaintiff would probably substantially lessen competition in the vanadium industry, a line of commerce within the meaning of § 7 of the Clayton Act (15 U.S.C.A. § 18), as amended.

4. Whether or not defendants' acquisition of plaintiff's stock was solely for investment within the meaning of § 7 of the Clayton Act (15 U.S.C.A. § 18), as amended, presents a serious question.

5. Defendants' claim of the right to vote the stock of plaintiff for the avowed purpose as defendants have stated constitutes a threat of harm to plaintiff. That right and its exercise should be enjoined.

■ 6. The threatened harm to plaintiff is enjoinable under § 16 of the Clayton Act (15 U.S.C.A. § 26).

7. A preliminary or injunction pendente lite should be granted to prevent irreparable damage to plaintiff which outweighs any substantial or perceptible harm to defendants.

8. The injunction sought by plaintiff's motion should be issued substantially in the terms as prayed for, and should be in such a form as follows:

INJUNCTION PENDENTE LITE

After hearing and argument, it is
ORDERED:

1. Until further order of this Court, defendants and each of them, their officers, agents, servants, employees, and attorneys, and all other persons acting by, on behalf of, or in concert with them or either of them, are jointly and respectively enjoined during the pendency of this action from directly or indirectly:

(a) Acquiring any additional shares of stock of plaintiff, *unless* the *parties agree* on a modus operandi via an escrow arrangement;

(b) Voting any shares of stock of plaintiff at any meeting of plaintiff's stockholders, or granting any proxy to vote any of said shares;

(c) Acquiring any representation, direct or indirect, on plaintiff's Board of Directors; or

(d) Taking any other action toward a merger, consolidation or other unity of interest between defendant, The Susquehanna Corporation, and plaintiff pendente lite.

90. The following cases, which in turn cite all the former cases, in the District of Delaware and the Third Circuit are: Dallas v. Atlantic Refining Co., D.C.Del., 189 F.Supp. 815; Clifton Park Manor, Section One v. Mason, D.C.Del., 137 F. Supp. 324, 325; Benton v. Glenn McCarthy, Inc., D.C.Del., 154 F.Supp. 670; Acme Fast Freight v. United States, D.C.Del., 135 F.Supp. 823; Sims v. Greene, 3 Cir., 161 F.2d 87; Warner Bros. Pictures v. Gittone, 3 Cir., 110 F.2d 292.

91. Hamilton Watch Co. v. Benrus Watch Co., supra, 206 F.2d p. 740.

92. Ibid. p. 742.

2. This order shall not be effective until after the plaintiff shall have filed with the Clerk of this Court a bond in the penal sum of $50,000.00 in form and with surety to be approved by this Court, and after such approval service of a copy of this order shall be made promptly upon the attorney of record for the defendants.

### On Motion for Reargument and Modification of Injunction Pendente Lite.

■ An injunction pendente lite has issued against threatened violation of § 7 of the Clayton Act.[1] One defendant, H. M. Byllesby & Company, seeks reargument and modification of the injunction,[2] because the court is "without jurisdiction" to enjoin Byllesby from "conducting its normal business for customers in the purchase and sale of securities of plaintiff." It would appear it has innocent customers who have kept their stock in Byllesby's name and, under the injunction, their shares would be disenfranchised from voting. Moreover, it appears Byllesby wants the injunctive order amended, presumably to let it buy shares of plaintiff's stock for the avowed account of its customers.

1. On the present record, to amend the pending injunction would weaken the protective sanctions now existent. There lurks the opportunity of evasion of the injunction. Byllesby could buy shares of plaintiff for a customer's account, but maybe for the account of the other defendant, Susquehanna. At this juncture of the litigation, the Court has no practical way of ascertaining the real facts.[3] No modification of the injunctive order is needed to enable innocent persons to purchase such amounts of stock they may want.[4] In addition, Byllesby states it "should be permitted to vote shares held for beneficial owners who are not in any way involved in this cause." But, no such beneficial owner has complained to the Court. In any event, the short answer to such complaints was given by the Delaware Supreme Court[5] to a similar argument— i. e., "The answer to this point is simple. Under the General Corporation Law, no one but a registered stockholder is, as a matter of right, entitled to vote * * *. If an owner of stock chooses to register his shares in the name of a nominee, he takes the risks attendant upon such an arrangement, including the risk he may not receive notice of corporate proceedings, or be able to obtain a proxy from his nominee."

At oral argument, plaintiff's counsel advised there was no desire to disenfranchise innocent shareholders whose stock stood in the name of defendant Byllesby at the time of the issuance of the injunction pendente lite. A practical procedure[6] could be formulated to insure that "customers'" shares of plaintiff's stock held on February 26, 1962 [date of injunction] would be voted in accord-

1. 28 U.S.C. § 1337; 15 U.S.C.A. § 18.

2. Defendants were enjoined from:
 "(a) Acquiring any additional shares of stock of plaintiff, unless the parties agree on a modus operandi via an escrow agreement;
 "(b) Voting any shares of stock of plaintiff at any meeting of plaintiff's stockholders, or granting any proxy to vote any of said shares;
 "(c) Acquiring any representation, direct or indirect, on plaintiff's board of directors; or
 "(d) Taking any other action toward a merger, consolidation or other unity of interest between defendant, * * * and plaintiff pendente lite."

3. Byllesby might purchase shares of plaintiff corporation for customers whom defendants might have persuaded to acquire the stock so it could be voted in favor of merger.

4. Plaintiff's stock is listed on the New York Exchange. Byllesby is not a member of that exchange, and when it buys, it deals through broker-members. Byllesby's so-called innocent customers can follow the same course.

5. American Hardware Corp. v. Savage Arms Corp., Del.Ch., 136 A.2d 690, 692

6. A mechanism to determine (a) who are actually beneficial owners, and (b) whether they are "not in any way involved in this cause" could be established. But this could not be on Byllesby's *ex parte* determination.

ance with directions of beneficial owners "not in any way involved in this cause." Unless some plan is adopted, then the interests of innocent shareholders must give way to the need of affording effective protective relief against violation of § 7 of the Act; otherwise, any other modification of the outstanding order would devitalize the injunction.[7] United States v. Crescent Amusement Co., 323 U.S. 173, 189–190, 65 S.Ct. 254, 89 L.Ed. 160; United States v. E. I. DuPont De Nemours & Co., 366 U.S. 316, 326, 81 S. Ct. 1243, 6 L.Ed.2d 318. In fact, plaintiff's counsel have stated a procedure can be adapted to the circumstances of the instant case—i. e., upon appropriate assurances from any innocent stockholders and defendants, plaintiffs here will authorize defendant Byllesby to vote such stockholders' shares as directed by the real stockholder. An example of such assurance, in the form of a sworn certificate, was offered by counsel for plaintiff to the court at the argument of the motion to modify the outstanding injunction pendente lite. But defendants made no articulation of adoption of the suggested procedure.

Byllesby's motion for modification of the outstanding injunction order is denied.

2. The other defendant Susquehanna Corporation moves for an order enjoining plaintiff from holding its stockholders' annual meeting[8] next month "for the election of directors or for any other purpose until 90 days, or such other number of days as the Court finds reasonable, after the entry of a final judgment * * *" in this cause. Plaintiff corporation is under a statutory duty to hold its annual meeting, which is an "important annual event."[9] The requirement is mandatory and a "duty imposed by Section 30" [now § 222] of the Delaware Corporation Law, resulting from the "command" of the statute "that directors be elected at the time and place named in the by-laws."[10]

There has been no basis shown to order plaintiff not to comply with its statutory duty to hold its annual meeting of stockholders on April 19, 1962.[11] The relief sought here by defendant Susquehanna calls for an extraordinary process.[12] "A court will interfere with the holding of stockholders' meetings only with great reluctance,"[13] and only where there are extreme circumstances or need to prevent irreparable wrong or damage.[14]

*No extreme circumstances exist here.* In situations of fraud, illegal or

7. To enable the voting of shares, owned by innocent customers of Byllesby but in this defendant's name, a procedure approved in Continental Insurance Co. v. United States, 259 U.S. 156, 175, 42 S.Ct. 540, 66 L.Ed. 871, might be adopted in the case at bar.

8. Under the Delaware Corporation Law, 8 Del.C. § 222 and plaintiff's by-laws, the annual stockholders' meeting has been fixed for April 19, 1962. Notice of the meeting has already been mailed.

9. In re Tonopah United Water Co., 16 Del. Ch. 26, 31, 139 A. 762, 764.

10. Gries v. Eversharp, Inc., 31 Del.Ch. 489, 496, 69 A.2d 922, 926; Hexter v. Columbia Baking Co., 16 Del.Ch. 263, 267, 145 A. 115, 116; Duffy v. Loft, Inc., 17 Del.Ch. 140, 148, 151 A. 223, 277, aff'd 17 Del.Ch. 376, 152 A. 849.

Cf. § 224 of the Delaware Corporation Law which affords a summary remedy to compel an election of directors where none has been held. Matter of Pioneer Drilling Co., Del.Ch., 130 A.2d 559, 560.

11. Serious jurisdictional questions might be present if the annual meeting were to be enjoined. Such relief is not afforded by any federal statute; and no diversity exists here. Cf. Textron, Inc. v. American Woolen Co., D.C.Mass., 122 F.Supp. 305, 307–309, where diversity did exist. See, too, Aldridge v. Franco-Wyoming Securities Co., 26 Del.Ch. 213, 214–215, 26 A.2d 544, 545, where the court indicated the moving party's pleading [defendants' Answers here] made out "no case for an injunction."

12. Hand v. Missouri-Kansas Pipe Line Co., D.C.Del., 54 F.Supp. 649, 651.

13. Campbell v. Loew's Incorporated, Del. Ch., 134 A.2d 565, 567.

14. 5 Fletcher, Cyc. etc. Private Corporations, 1952 Ed., § 2071, p. 302.

unfair conduct, a stockholders' meeting may be enjoined to prevent irremediable injury. E. g., a stockholders' meeting improperly convened can be enjoined;[15] or to prevent interference with a court having receivership jurisdiction;[16] or where wrongful solicitation of proxies may demand an adjournment to prevent disenfranchisement.[17] Hamilton Watch Co. v. Benrus Watch Co., D.C.Conn., 114 F.Supp. 307, was the case—in a situation such as presented here—of novel impression under § 7 of the Clayton Act. There, as in the instant case, a preliminary injunction had been granted under § 7 restraining "defendant from voting shares of plaintiff's stock." A motion was made to stay the injunction pending an appeal from its entry. Judge Hincks [then Chief Judge] neither stayed the injunction pending appeal nor enjoined the stockholders' meeting until after final judgment in the pending cause. Likewise, in Briggs Mfg. Co. v. Crane Co., E.D.Mich., 185 F.Supp. 177, a preliminary injunction issued under § 7 of the Clayton Act enjoining defendant there from soliciting proxies or voting stock at the annual meeting of the plaintiff's stockholders—and, the annual meeting itself was not enjoined. Upon a consideration of the specific equities present in the case at bar, no extreme circumstances warrant the injunction now sought by the defendants here to disturb the injunction pendente lite granted in plaintiff's favor.

 *No irreparable injury to either defendant has been established.* "It is well established that a preliminary injunction enjoining the holding of a corporate meeting for the election of directors will not be granted unless the denial thereof would cause an 'irreparable injury,'"[18] because, as I have suggested, the damage threatened to the moving party must be irremediable.[19] There is a burden of establishing need for such relief[20] and the present defendants have failed to demonstrate any substantial or perceptible harm to outweigh the potential and irreparable damage plaintiff demonstrated at the time of the award of the injunction pendente lite to plaintiff.

Since defendants have shown neither 1. exceptional circumstances to justify an injunction against plaintiff following its statutory duty to hold its annual stockholders' meeting, nor 2. any irreparable damage from denial of the motion, defendants' motion to enjoin the annual meeting of plaintiff is denied.

Orders may be submitted.

15. Callister v. Graham-Paige Co., D.C. Del., 146 F.Supp. 399; Steinberg v. American Bantam Car Co., W.D.Pa., 76 F. Supp. 426; Textron, Inc. v. American Woolen Co., supra; Gries v. Eversharp, Inc., supra.

16. In re Public Service Holding Corp., 2 Cir., 141 F.2d 425.

17. Hand v. Missouri-Kansas Pipe Line Co., D.C.Del., 54 F.Supp. 649, 651, note 5. See, too, S. E. C. v. O'Hara Re-Election (or Proxy) Committee, D.C.Mass., 28 F.Supp. 523, 525; S. E. C. v. May, S.D.N.Y., 134 F.Supp. 247, 258, aff'd. 2 Cir., 229 F.2d 123, 55 A.L.R.2d 1123; Willoughby v. Port, 2 Cir., 277 F.2d 149; Empire Southern Gas Co. v. Gray, 29 Del.Ch. 95, 111–112, 46 A.2d 741, 749. Cf. S. E. C. v. Okin, S.D.N.Y., 58 F.Supp. 20, 25.

18. Hauth v. Giant Portland Cement Co., 33 Del.Ch. 496, 499, 96 A.2d 233, 235.

19. Hand v. Missouri-Kansas Pipe Line Co., supra.

20. Peck v. Greyhound Corp., S.D.N.Y., 97 F.Supp. 679, 681; Curtin v. American Telephone & Telegraph Co., S.D.N.Y., 124 F.Supp. 197–198; Dunn v. Decca Records, S.D.N.Y., 120 F.Supp. 1, 3; Weeks v. Alpert, D.C.Mass., 131 F.Supp. 608–609; H. L. Green Co., Inc. v. Industrial Development, Inc., 8 A.D.2d 785, 186 N.Y.S.2d 679, 680.