**ALLIS–CHALMERS MANUFACTURING COMPANY, Plaintiff,**

v.

**WHITE CONSOLIDATED INDUSTRIES, INC., Defendant.**

**Civ. A. No. 3646.**

United States District Court
District of Delaware.

Jan. 22, 1969.

---

10. See, e. g., Southern Machine Co. v. Mohasco Industries, Inc., supra, Note 7 at 380–381 of 401 F.2d.

S. Samuel Arsht and Lewis S. Black, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Del., S. Hazard Gillespie, Roland W. Donnem, and Christopher Crowley, Davis, Polk & Wardell, New York City, John S. Lieb, Milwaukee, Wis., for plaintiff.

Blaine T. Phillips, Potter, Anderson & Corroon, Wilmington, Del., George I. Meisel, Richard M. Donaldson and John T. Scott, Jr., Squire, Sanders & Dempsey, and Ward Smith, for White Consolidated

Industries, Inc., Cleveland, Ohio, for defendant.

## OPINION

WRIGHT, Chief Judge.

This is an action by plaintiff, Allis-Chalmers Manufacturing Company (Allis-Chalmers), for a preliminary injunction restraining defendant, White Consolidated Industries, Inc., (White), from violating § 7 of the Clayton Act, 15 U.S.C. § 18, by exercising its present stock interest in or acquiring further stock interest in Allis-Chalmers.[1] Jurisdiction is based on 28 U.S.C. § 1651(a), 28 U.S.C. § 1337, and 15 U.S.C. § 26.

Allis-Chalmers is a diversified manufacturing enterprise whose principal business is the production of diverse capital goods equipment and construction and agricultural machinery. Its annual sales total about $821,000,000. White is also a diversified manufacturer, specializing in a wide variety of machinery and equipment, household appliances, and industrial supplies. Its sales total about $825,000,000 per year. White's great diversification has been accomplished most notably by its acquisition of no less than ten companies since 1963; White now seeks to acquire another—Allis-Chalmers. To this end, White has purchased 31.2% of Allis-Chalmers stock from Gulf and Western Industries.[2] White now proposes to make a tender offer to Allis-Chalmers stockholders for the purpose of substantially increasing its share of ownership. The date and terms of that tender offer are still unknown.

Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits acquisition, in whole or in part, of the stock of a corporation "where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition * * *." Section 7 does not require a showing of existing or certain anti-competitive effects; indeed, its purpose is to interfere with movement toward undue concentration of economic power before anti-competitive effects can manifest themselves. United States v. Philadelphia National Bank, 374 U.S. 321, 362, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); Vanadium Corporation of America v. Susquehanna Corp., 203 F.Supp. 686, 695 (D.Del.1962). Accordingly, it is sufficient for the complaining party to establish a "reasonable likelihood * * * that the acquisition will result in a restraint of commerce * * *." United States v. E. I. du Pont de Nemours Co., 353 U.S. 586, 592, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957).

Injunctive relief is particularly suited to the preventive function of § 7 and Congress has expressly extended the availability of the injunctive remedy to private parties. 15 U.S.C. § 26. The standards applicable to preliminary injunctive relief, sought here, are well-settled:

"To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i. e. the balance of hardships tips

---

1. On December 18, 1968, this Court issued an ex parte temporary restraining order barring White from "directly or indirectly soliciting, contacting or communicating by public announcement or otherwise with other shareholders of Allis-Chalmers Manufacturing Company, or any other person, for the purpose of acquiring additional stock in Allis-Chalmers Manufacturing Company or announcing an intention of acquiring or of taking steps to acquire additional stock in Allis-Chalmers Manufacturing Company." That order has been extended by agreement of the par-

ties until such time as the Court renders decision on plaintiff's application for a preliminary injunction.

2. There is no question that this block of shares, purchased December 6, 1968, was not acquired for investment purposes. Item 4 of Schedule 13 D which White filed with the Securities and Exchange Commission subsequent to its acquisition states: "The ultimate purpose underlying the purchase by White described herein is the acquisition of the business of the issuer." Stevenson Affidavit, Exhibit D.

decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir. 1953). See also Vanadium Corp. of America v. Susquehanna Corp., supra, 203 F.Supp. at 697. In other words, plaintiff must demonstrate a reasonable probability of success on final hearing. United States v. Ingersoll-Rand Co., 320 F.2d 509, 525 (3 Cir. 1963).

Turning to the specific facts of this action, the anti-trust implications of the White takeover have, after review of the evidence and argument of counsel, assumed an unusual cast. Despite generic similarity of a number of the markets in which White and Allis-Chalmers compete, there appears to be little actual overlap in the products of these two companies when the generic categories are broken down into specific markets. Indeed, virtually all direct competition is between Allis-Chalmers and the Blaw-Knox Company, a subsidiary of White, and even there, the overlap is not sufficient to indicate reasonable probability of a Clayton Act violation. Allis-Chalmers conceded this point at the hearing held January 14, 1969. See Transcript of Oral Argument, January 14, 1969, pp. 18–19; see also p. 61. In view of this concession, Allis-Chalmers grounds its entire action on the effects a White takeover will have on potential competition between the two companies. Specifically, Allis-Chalmers claims that it is a likely entrant into the electrical appliance and metal rolling mill markets in which White is already a significant factor. In addition, Allis-Chalmers claims to be a potential competitor of White in the area of "custom machine shop capacity." In these three areas, Allis-Chalmers alleges that a combination of the two companies will substantially lessen imminent competition.[3]

■■ It is well-established that probable elimination of potential competition is one ground for injunctive relief under the Clayton Act. United States v. Wilson Sporting Goods Co., 288 F.Supp. 543, 559–563 (N.D.Ill.1968).[4] See also Federal Trade Commission v. Proctor & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). In evaluating the effect of a takeover on potential competition, there are two distinct inquiries the Court must make. First, will the acquisition "remove as an independent competitive force a firm that, although not actually selling in the market of the acquired firm, has had a substantial impact on the behavior of companies in that market because it was recognized as a likely entrant?" Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1362 (1965). Secondly, will the acquisition remove "a firm that would actually have entered the acquired firm's market by internal expansion if the merger had not occurred?" Id. See United States v. Wilson Sporting Goods Co., supra, 288 F.Supp. at 559. The factors relevant to these in-

---

3. In its trial memorandum and affidavits, Allis-Chalmers lists several additional areas of potential competition, including manufacture of paper-making machinery (White is alleged to be the potential competitor here), manufacture of concrete mixers, pavers, etc., food processing (both White and Allis-Chalmers are alleged to be potential entrants here), manufacture of material handling equipment, and manufacture of machine tools. After careful review of the papers before it, the Court concludes that the evidence in support of these allegations is inadequate to es-

tablish a likelihood of entry or any anti-competitive effects of preclusion of entry sufficient to warrant the temporary injunctive relief sought here.

4. Note, however, the Court's holding in Wilson Sporting Goods that: " * * * the loss of Wilson's influence on competition as one of a recognized small group of large potential entrants, waiting on the edge of the market, constitutes only one factor in opposition to the merger. Were it the only factor, it would not be sufficient to block the merger." 288 F.Supp. at 563.

quiries are, briefly stated, "the rate of growth and competitive structure of the market, the number of other potential entrants, the company's interest in and capability of entering." American Bar Association, Antitrust Developments 1955–1968 (1968), p. 87. See United States v. Penn-Olin Chemical Co., 378 U.S. 158, 175, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); see also United States v. El Paso Natural Gas Co., 376 U.S. 651, 660, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964).

Considering first the allegation that Allis-Chalmers is a likely entrant into the electrical appliance market, the evidence before the Court in support of the allegation consists entirely of statements by key members of Allis-Chalmers management, particularly Allis-Chalmers' President, David C. Scott, that Allis-Chalmers has instituted negotiations with a foreign manufacturer of electrical appliances for the purpose of establishing supply arrangements and that it is the intention of Allis-Chalmers to become "another General Electric." Verified Complaint, ¶ 30; Scott Affidavit ¶ 29. In addition, Allis-Chalmers raises as objective evidence of likely success in the proposed expansion an established brandname and an established chain of Allis-Chalmers distributors capable of merchandising household appliances.

The evidence presented in opposition to the likelihood of Allis-Chalmers' entry, however, is overwhelming. To begin with, it appears that the electric appliance industry is saturated with competitors so that profitable entry into the market is difficult. The failure of both International Harvester and Philco-Ford to establish viable positions in this field in recent years highlights the difficulty. The dominance of such giants as General Electric, Westinghouse, Whirlpool, Frigidaire (a division of General Motors), and Kelvinator (a subsidiary of White) in the appliance industry make successful entry even less likely.

Entry is, of course, out of the question without an established system for distributing the products. While Allis-Chalmers does indeed have 2300 outlets available for merchandising of appliances, none of these outlets have any significant experience in handling indoor appliances.[5] In addition, the vast majority of these outlets are in the rural areas, well removed from the burgeoning urban market for appliances.

Allis-Chalmers financial capacity to enter the appliance market is also open to question. Any significant thrust into this field would most certainly require a substantial investment, even where the entrant does not undertake to manufacture its own appliances. Allis-Chalmers has predicted a pre-tax loss of $50,000,000 for 1968; its net earnings on more than $820,000,000 in sales in 1967 were but $5,000,000 or $.41 per share. In this light, Allis-Chalmers hardly seems in a position to invest large amounts of capital in the market for electrical appliances.

Finally, there is little evidence before the Court of serious consideration of this undertaking. There is nothing to indicate that Allis-Chalmers has made cost or competition studies of the appliance market. Until the Complaint in this action was filed, no public mention had ever been made of an intention to even consider entry into this market. Indeed, a comprehensive financial report prepared for Allis-Chalmers by Laird, Inc., in November, 1968 made no mention of the proposed expansion.

█ In light of the foregoing, the Court deems the evidence insufficient to establish a reasonable probability that Allis-Chalmers can demonstrate on final trial either imminent entry or the requisite competitive influence of potential entry into the electrical appliance market.

Allis-Chalmers next alleges that a White takeover will eliminate potential

5. The Allis-Chalmers distributors have, to date, dealt almost exclusively with outdoor consumer goods such as small utility tractors, riding lawn mowers, snow throwers, etc. Total sales over a period of seven years (1961–1968) have been but $17,500,000 with no indication in the record of degree of profitability. Tr. 22–23.

competition in what it labels "large custom machine shop capability." Allis-Chalmers claims 15% of the national capacity and asserts that White has 5% of the national capacity in this area. White vigorously disputes these figures, arguing that the term "large custom machine shop capability" has little if any meaning. See Adelman and Shapiro Affidavits.

While the Court is itself uncertain of what the Allis-Chalmers term encompasses, it will assume for the present that it refers simply to a capacity to manufacture a wide range of "made to order" products by virtue of existing machinery, equipment, and facilities. In other words, "large custom machine shop capability" is not itself a product or line of commerce but only the wherewithal to manufacture certain products. Tr. 99.

■ The evidence is reasonably clear that both Allis-Chalmers and White, through its Blaw-Knox subsidiary, do have some capacity to produce a wide variety of custom products. See Hauck and Druml Affidavits. However, in the absence of more detailed information about specific categories of products each company can produce, it is impossible for the Court to examine the competitive outline of the relevant markets. That is, without a more detailed summary of the full panoply of products each company can produce, there can be no evaluation of overlap or possibility for direct competition between them. And, while it may be true that, with their custom machine shop capabilities, both parties can produce the same "Product X," it may also be the case that, as to that product, there are a hundred or more other manufacturers capable of production.[6] Accordingly, there is insufficient evidence to establish reasonable probability of success of final trial of this issue.

Finally, Allis-Chalmers asserts that its entry into the manufacture and construction of metal rolling mills—an area in which Blaw-Knox is active—is sufficiently probable to warrant restraint of White's takeover. However, the only evidence before the Court of Allis-Chalmers potential competition in this field is an assertion by Allis-Chalmers management that such entry is contemplated. Aside from the fact that Allis-Chalmers now manufactures and constructs papermaking machinery, Tr. 11–12, there is nothing in the record to confirm that Allis-Chalmers has the technological capacity to enter this market. Nor is there evidence to confirm financial capacity to enter, the ability of the market to support an additional competitor, or Allis-Chalmers' serious consideration of entry. Finally, the record does not indicate that Allis-Chalmers, by the nature of its present business, stands close enough to the edge of the metal rolling mill market to exert a competitive influence on others in that industry.

■ Accordingly, Allis-Chalmers has failed to demonstrate reasonable probability of success on final trial of this issue.

■ There being no showing of reasonable probability of success on final trial of the anti-trust allegations, injunctive relief must be denied irrespective of the balance of hardships in this case.[7]

---

6. Indeed, Professor Adelman's examination of products emanating from what he assumes is this capacity reveals that from 144 to 1481 companies compete in the same lines of commerce.

7. The Court notes the following conclusions on the issue of irreparable injury: Where a party has satisfactorily demonstrated reasonable probability of establishing a § 7 violation on final trial of the issue, the Court should properly consider injury to the public as well as injury to the immediate parties in deciding whether a preliminary injunction should issue. See Vanadium Corp. of America v. Susquehanna Corp., supra, 203 F.Supp. at 696. Indeed, if probable anti-competitive effects may reasonably be expected to manifest themselves in the interim between denial of preliminary relief and final determination of the merits and those anti-competitive effects are irre-

Plaintiff's application for a preliminary injunction is denied. The foregoing opinion is adopted as the Court's Findings of Fact and Conclusions of Law pursuant to F.R.Civ.P. 52(a), 28 U.S.C.A.

Submit order in accordance herewith.

versible, the injury to the public which, by definition, follows is entitled to considerable weight. See United States v. Wilson Sporting Goods Co., supra 288 F. Supp. at 568–570.

After careful review of the record in this case, the Court is of the opinion that, had there been a showing by Allis-Chalmers of reasonable probability of success on final hearing of the § 7 issue, the Court would have been compelled to grant a preliminary injunction. Evaluation of future harm to the public and the parties is, of course, a highly speculative undertaking; however, the Court is convinced that the imminence of a White tender offer, the disruptive effects of unscrambling a White-Allis-Chalmers combination, and the probable injury to the public of such a combination (assuming it to be illegal), when considered together, would have justified injunctive relief.

The Court reiterates that there has been no showing of probable success by Allis-Chalmers and that, therefore, the issue of irreparable injury is not in fact before the Court.